The STATE of Ohio, Appellee,

v.

MUNDY, Appellant.■

[Cite as *State v. Mundy* (1994), 99 Ohio App.3d 275.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 14156.

Decided Dec. 16, 1994.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Carley J. Ingram,* Assistant Prosecuting Attorney, Appellate Division, for appellee.

*Dwight D. Brannon,* for appellant.

WILSON, Judge.

Defendant Thomas Mundy appeals from his conviction and sentence on twelve counts of gross sexual imposition, R.C. 2907.05(A)(4), for having sexual contact with his three minor grandchildren.

Mundy presents eight assignments of error on appeal. Those assignments concerning the presentation of evidence against him and the conduct of the prosecuting attorney will be overruled. Two assignments concerning the instructions given to the jury on the culpable mental state required for these offenses and Mundy's claim of intoxication as it relates to that culpable mental state will be sustained. Because these errors denied Mundy his right to a fair trial, his convictions must be reversed and the case remanded for a new trial.

The assignments of error presented by Mundy are discussed below in the order in which they were presented.

## I

"This court should reverse appellant's conviction and dismiss the charges because [R.C.] § 2907.05(A) is void for vagueness and overbroad in violation of the Fourteenth Amendment to the United States Constitution and Art. I, § 10 of the Ohio Constitution."

Mundy argues that the gross sexual imposition statute, R.C. 2907.05(A)(4), formerly 2907.05(A)(3), is unconstitutional, both facially and as applied in this case. This argument, which was raised by Mundy in written motion during the trial and in post-trial motions, was rejected by the trial court.

## A

### Facial Validity

All legislative enactments enjoy a strong presumption of constitutionality. *State v. Collier* (1991), 62 Ohio St.3d 267, 581 N.E.2d 552. In arguing that a statute is vague or overly broad, a defendant has the burden to overcome that presumption and to prove the defect asserted beyond a reasonable doubt.

" * * * '[i]n order to prove such assertion, the challenging party must show that the statute is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. * * * " *Coates v. Cincinnati* (1971), 402 U.S. 611, 614 [91 S.Ct. 1686, 1688, 29 L.Ed.2d 214, 217]. In other words, the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law. Thus, to escape responsibility * * *, appellee must prove, beyond a reasonable doubt, that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged.' " *Collier, supra,* 62 Ohio St.3d at 269, 581 N.E.2d at 553–554.

In examining the void-for-vagueness doctrine, a three-part analysis is applied to the challenged statutory language. *Collier, supra.* First, it must be determined whether R.C. 2907.05(A)(4) provides adequate notice and fair warning of what conduct is prohibited so that persons of ordinary intelligence can conform their conduct to the dictates of the statute. *Id.*

R.C. 2907.05 provides in pertinent part:

"(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact

with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

" * * *

"(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

"Sexual contact" is defined in R.C. 2907.01(B):

" 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

R.C. 2901.22 provides, *inter alia:*

"(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

 Mundy argues, and the state concedes, that R.C. 2907.05(A)(4) does not impose strict liability. Although the language used in that provision fails to specify any culpability, the "sexual contact" that is an essential element of R.C. 2907.05(A)(4) is defined in R.C. 2907.01(B) as the touching of certain described parts of the human body *for the purpose of sexually arousing or gratifying either the offender or the victim.* Thus, the culpable mental state required for a conviction of R.C. 2907.05(A)(4) is supplied by the statutory definition of "sexual contact" in R.C. 2907.01(B). In other words, in proving the violations of R.C. 2907.05(A)(4) in this case, it was incumbent upon the state to prove not only that Thomas Mundy touched a person less than. thirteen years of age or caused a person under age thirteen to touch him on the proscribed parts of the body listed in R.C. 2907.01(B), including the genitals and in the case of a female the breasts, but *also* that Mundy committed these acts for the specific purpose or intention of sexually arousing or gratifying either himself or the victim. *In re Grigson* (Apr. 15, 1991), Scioto App. No. 1881, unreported, 1991 WL 62177; *State v. Schaim* (1992), 65 Ohio St.3d 51, 57, 600 N.E.2d 661, 666, at fn. 4. To the extent that *State v. Astley* (1987), 36 Ohio App.3d 247, 523 N.E.2d 322, and *State v. Aiken* (June 10, 1993), Cuyahoga App. No. 64627, unreported, 1993 WL 204646, held otherwise, we are not persuaded by the reasoning in those cases and decline to follow such.

We believe that the conduct forbidden by R.C. 2907.05(A)(4) is readily comprehensible and understandable and that a person of ordinary intelligence would not have to guess as to its meaning. Thomas Mundy argues, however, that the

statute lacks clearly defined standards and does not provide adequate notice and fair warning of the prohibited conduct because the required specific intent of "sexual arousal or gratification," which is part of the definition of "sexual contact" and an essential element of R.C. 2907.05(A)(4), is not defined by the Revised Code. Moreover, Mundy asserts that it is unclear from the conflicting case law whether a subjective or an objective test is applied to determine the existence of sexual arousal or gratification. We are not persuaded by this argument.

As we have noted, in proving a violation of R.C. 2907.05(A)(4), one of the elements that the state must prove is the defendant's subjective purpose or specific intention. In order to convict a defendant of this offense, the state is obligated to prove beyond a reasonable doubt that the defendant's purpose or specific intention in touching the victim on the proscribed areas of the body set out in R.C. 2907.01(B) was sexual arousal or gratification of either the perpetrator or the victim.

Proof of an accused's purpose or specific intent invariably requires circumstantial evidence, absent an admission. In *Grigson, supra,* the court observed:

"Appellant essentially contends that there was no direct evidence of the mens rea element concerning arousal so as to distinguish between a sexual act and a mere physical assault. The determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. This is, in fact, the well-recognized process of inferential reasoning. This process by necessity incorporates an objective mechanism or standard in determining the defendant's state of mind by the use of circumstantial evidence. The trier of fact reviews the defendant's conduct in light of the surrounding facts and circumstances and infers a purpose or motive. This conclusion by the trier of fact reflects the purpose that an ordinary prudent person would ascribe to a defendant's conduct."

With respect to prosecutions such as this one under R.C. 2907.05(A)(4):

"[T]he proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01. In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim. If the trier of fact determines, that the defendant was motivated by desires of sexual arousal or gratification, and

that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *State v. Cobb* (1991), 81 Ohio App.3d 179, 185, 610 N.E.2d 1009, 1013.

Simply put, R.C. 2907.05(A)(4) forbids touching a person under age thirteen or causing a person under age thirteen to touch the offender on certain parts of the body, including the genitals, buttocks, or in the case of a female the breasts, for the specific purpose of sexually arousing or gratifying either person. Whether that touching was undertaken for the purpose of sexual arousal or gratification must be inferred from the type, nature, and circumstances surrounding the contact. In other words, would an ordinary prudent person or a reasonable person sitting as a juror perceive from the defendant's actions, and all of the surrounding facts and circumstances, that *the defendant's purpose* or specific intention was arousal or gratification of sexual desire. We conclude that the conduct forbidden by R.C. 2907.05(A)(4) is comprehensible to a person of ordinary intelligence, and that the language used is sufficient to afford an ordinary citizen adequate notice and fair warning of the prohibited conduct so that he may conform his behavior accordingly.

Next, we must determine whether R.C. 2907.05(A)(4) provides sufficient guidelines to law enforcement officials seeking to enforce its provisions. In other words, is R.C. 2907.05(A)(4) susceptible to arbitrary, capricious, discriminatory enforcement by officials who are given too much authority and too few constraints? *Collier, supra.* We think not.

R.C. 2907.05(A)(4) provides explicit standards for those charged with enforcing that provision. The language utilized, and more particularly the culpable mental state requirement that the offender's touching of the prohibited areas of the body be done for the purpose or specific intention of sexual arousal or gratification, leaves no discretion as to application and enforcement of that statute. It is not simply any or all contact with the proscribed areas of the body which the statute forbids; that would leave law enforcement officials to ask whether contact in any particular factual context constitutes criminal behavior or innocent conduct. Rather, it is a touching for the specific purpose of sexual arousal or gratification which violates the statute. It is this culpability, the specific intent or purpose to achieve sexual arousal or gratification from the touching, which distinguishes criminal conduct from noncriminal, innocent behavior, such as accidental touching or a touching of the prohibited areas incidental to bathing, changing a diaper, or playful wrestling. R.C. 2907.05(A)(4) provides constitutionally adequate guidelines which enable law enforcement officers to enforce and apply that provision in an evenhanded manner.

Last, we must determine whether R.C. 2907.05(A)(4) unreasonably impinges upon constitutionally protected freedoms. In this regard Mundy argues that the statute is overbroad and chills constitutionally protected conduct because it criminalizes proper parental care, such as a touching of the prohibited areas of the body that might occur incidental to changing a diaper or giving a child a bath. We do not agree with this argument.

First of all, the overbreadth doctrine has no application to criminal statutes outside a First Amendment context. *Collier, supra.* Even assuming *arguendo* that parental care may fall within the ambit of the First Amendment expression, R.C. 2907.05(A)(4) does not unconstitutionally chill that protected conduct because the statute does not criminalize any or all touching of a person under age thirteen on the prohibited areas of the body regardless of the circumstances. Rather, the statute contains a constitutional safeguard: that only a touching of the prohibited areas for the specific purpose of sexual arousal or gratification may constitute criminal conduct under the statute. Obviously, there is no constitutionally protected right to touch the genitals, buttocks, or breasts of a child under age thirteen for the purpose of arousing or satisfying sexual desire of the actor. R.C. 2907.05(A)(4) properly distinguishes criminal conduct from innocent behavior and does not impinge upon constitutionally protected conduct.

Accordingly, we conclude that R.C. 2907.05(A)(4) is not facially vague or overbroad in violation of the United States and Ohio Constitutions.

## B

### Application of the Statute

Thomas Mundy additionally argues that R.C. 2907.05(A)(4) is unconstitutional as applied in his case. This argument is premised upon Mundy's contention that the trial court failed to require the state to prove one of the essential elements of the offense: that when Mundy touched the victims in this case on certain parts of their bodies he did so with the requisite culpable mental state, that is, for the purpose of sexually arousing or gratifying either himself or the victims. Thus, Mundy argues that the trial court's failure to require proof of his purpose or specific intent removed the very safeguard that protects R.C. 2907.05(A)(4) from being vague and overbroad.

As noted earlier, in proving the violations of R.C. 2907.05(A)(4) in this case the state was obligated to prove Mundy's purpose or specific intent: that in touching the victims on certain parts of their body Mundy had the purpose of or specific intention to sexually arouse either himself or the victim. This is the culpability required for a violation of R.C. 2907.05(A)(4).

When a criminal offense specifies a culpable mental state, a finding of guilt is precluded unless the state proves *both* the offender's prohibited conduct or actions and the requisite degree of culpability. See R.C. 2901.21(A). "Purpose" or "specific intent," which is defined in R.C. 2901.22(A), involves a subjective state of mind; it is the accused's particular purpose or specific intention in doing the prohibited act which must be proved by the state.

During the trial Mundy argued in a written brief that R.C. 2907.05(A)(4) is not a strict liability offense and, therefore, that a violation requires proof of his purpose or specific intent. Mundy further argued that evidence of intoxication would be relevant and admissible for the purpose of negating that specific intent. It is evident from a review of the record that the trial court believed, erroneously in our opinion, that purpose or specific intent is not an essential element of R.C. 2907.05(A)(4). In overruling Mundy's motion for acquittal at the close of all the evidence, the trial court stated:

"Implicated in that, of course, is the issue. The motion was whether or not purpose is an element of the offense. In other words, whether or not the State must prove that the defendant had a purpose to sexually arouse or gratify someone, and whether or not the State must prove in their mind that the defendant had a purpose. The Court has ruled during that plea the first week of trial, has done independent research subsequent to that, and continues to believe that purpose is not an element of the offense. Were purpose an element of the offense, then I think the Rule 29 motion would be a much closer question for the Court's consideration."

Mundy timely filed written requests for several jury instructions. Among the instructions requested, Mundy sought the following instructions:

*"Jury Instruction No. 3*

"The statute with which the Defendant is charged requires that he have touched for the purpose of sexually arousing or gratifying either person involved. Consequently, you must find that at the time in question, there was present in the mind of the Defendant a specific intention to sexually arouse either himself or the alleged victim.

*"Jury Instruction No. 4*

"If you find by a preponderance or greater weight of the evidence that by reason of intoxication the mind of the accused was in such condition that he was not capable of forming a purpose to sexually gratify or arouse himself than [*sic*] he is not guilty of gross sexual imposition, as purpose is an essential element of that offense.

*"Proposed Jury Instruction*

"A person is not guilty of the offense of gross sexual imposition unless both of the following apply:

"(1) His liability is based on conduct which includes either a voluntary act, or an omission to perform an act or duty which he is capable of performing;

"(2) He has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense."

The trial court refused to give any of the instructions Mundy had presented. At a conference held prior to instructing the jury, Mundy also requested an instruction defining "purpose" or "specific intent." The trial court rejected that request. Mundy objected to the court's refusal to give that particular instruction and the other instructions requested. Mundy further objected to the trial court's instructing the jury that the state did not have to prove Mundy's intent. As purpose or specific intent is an essential element of R.C. 2907.05(A)(4), Mundy was clearly entitled to have the jury instructed accordingly. Moreover, Mundy was entitled to have "purpose" or "specific intent" defined.

In instructing the jury on the offense charged, the trial court followed the language of R.C. 2907.05(A)(4) and gave the statutory definition of "sexual contact" found in R.C. 2907.01(B):

"In each count the defendant is charged with Gross Sexual Imposition. Before you can find the defendant guilty of any or all of the charges you must find beyond a reasonable doubt that during the time alleged in the indictment (as described above) and in Montgomery County, Ohio, the defendant had sexual contact with another or caused another to have sexual contact with the defendant, said other person was not the spouse of the defendant and the other person was less than 13 years of age, whether or not the defendant knew the age of such person.

" 'Sexual contact' means any touching of an erogenous zone of another, including without limitation to the thigh, genitals, buttock, pubic region, or, if such person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

The trial court then instructed the jury as follows:

"In making your determination of whether the defendant had sexual contact with any of the alleged victims for the purpose of sexually arousing or gratifying or [*sic*] himself your focus must be on the conduct involved and not the defendant's motive for such conduct. *Sexual contact is any touching of the described areas which a reasonable person would perceive as sexually stimulat-*

*ing or gratifying.* In applying the standard you will consider all the evidence surrounding the alleged contact. The evidence of intoxication that you heard is relevant when determining *whether the touching would be perceived by a reasonable person as being sexually stimulating or gratifying.*" (Emphasis added.)

The foregoing instruction is a serious misstatement of the law, and in our view prejudiced Mundy's right to a fair trial by permitting the jury to convict him on a finding concerning his mental state different from and less stringent than the charges against him require.

A mental state is not, absent an admission of it, readily evident to an onlooker. Therefore, whether or not one accused of a criminal offense has acted with the culpable mental state that the law requires for its commission is a question proved by objective facts, from which the jury may draw reasonable inferences. Nevertheless, the mental state itself is a subjective condition—what the particular accused in fact intended when he or she committed the prohibited act.

When the court instructed the jury that in order to determine Mundy's mental state it could consider whether a "reasonable person" in Mundy's position would have perceived the contact involved to be sexually stimulating or gratifying, the court directed the jury away from what Mundy subjectively intended, his specific intent, and to the broader issue of what a person aware of the natural consequences of his acts ought to have expected would result from them. That is the objective, reasonable-person standard applicable when the culpable mental state required for an offense is "negligence," as that is defined in R.C. 2901.22(D). The standard for gross sexual imposition, however, is the more stringent requirement of "specific intent," as defined in R.C. 2901.22(A). The court, through this instruction, provided the jury the wrong standard to follow in determining an element of the offense crucial to the ultimate issue of Mundy's guilt or innocence, one that permitted the jury to convict on a finding of what Mundy could or should have intended rather than on a finding of what his actual intent was.

In the course of instructing the jury on voluntary intoxication, the trial court stated:

"You have heard testimony concerning whether or not the defendant, Thomas D. Mundy, was voluntarily intoxicated at the time the alleged offenses occurred.

"Voluntary intoxication exists when a person acting on his own free will consumes a quantity of an intoxicating beverage containing alcohol, sufficient to adversely affect his mental processes and to deprive him of that clearness of intellect that he would have otherwise possessed.

"Voluntary intoxication is not a defense in the State of Ohio to the crime of Gross Sexual Imposition as charged in the indictment.

"Evidence of intoxication is relevant, as previously indicated, in determining what a *reasonable person would perceive* but intoxication is not a defense because *the State need not prove the defendant's intent.*" (Emphasis added.)

This instruction repeated the earlier error of substituting the objective, reasonable-person standard for the subjective, specific-intent standard in determining Mundy's purpose in acting as he did, though in relation to the issue of voluntary intoxication. Even there, however, in the context of specific intent, the question for the jury was whether and how his condition of intoxication prevented Mundy from forming the purpose required by the statute—the sexual gratification of himself or his victims. The instruction given permits the jury to convict if it finds that Mundy's degree or state of intoxication would not impair the perception of a reasonable person.

The instruction on intoxication given by the court concludes with the statement that "the State need not prove the defendant's intent." This view, which is at odds with the court's prior instructions that the jury must determine Mundy's "purpose," is nevertheless in accord with the rule of *State v. Astley* (1987), 36 Ohio App.3d 247, 523 N.E.2d 322, holding that the crime of gross sexual imposition, as defined in R.C. 2907.05(A)(3), is "a strict liability offense that requires no precise culpable state of mind." *Id.* at 250, 523 N.E.2d at 325. "All that is required is a showing of the proscribed sexual contact." *Id.* See, also, *State v. Aiken* (June 10, 1993), Cuyahoga App. No. 64627, unreported, 1993 WL 204646. We disagree with and reject this view.

In *Astley,* the defendant was charged with rape, R.C. 2907.02(A)(3), and with gross sexual imposition, R.C. 2907.05(A)(3). Rape prohibits "sexual *conduct* with another" under certain conditions. "Sexual conduct" is defined in R.C. 2907.01(A):

" 'Sexual conduct' means vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

Gross sexual imposition, on the other hand, prohibits "sexual *contact* " with another under certain conditions. "Sexual contact" is defined in R.C. 2907.01(B):

" 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, *for the purpose of sexually arousing or gratifying either person.*" (Emphasis added.)

■ Because sexual contact includes an express culpability requirement, "purpose," which is defined in R.C. 2901.22(A), pursuant to R.C. 2901.21(A) the state *is* required to prove that a defendant charged with gross sexual imposition acted with the required purpose. Sexual conduct, however, specifies no degree of culpability and plainly indicates a purpose to impose strict criminal liability for commission of the acts involved. Therefore, pursuant to R.C. 2901.21(B), culpability is *not* required to commit the offense of rape, which consists of prohibited sexual conduct.

■ In *Astley,* the court held that rape, defined as prohibited sexual conduct with another, requires no proof of the perpetrator's intent, but only proof of his or her conduct, because the crime is victim-oriented. "The rationale underlying this section is protection of the victim from sexual conduct, rather than to define the conduct in terms of the offender's intent." *Id.,* 36 Ohio App.3d at 249, 523 N.E.2d at 325. We agree with that view. The court then went on to apply the same rationale to gross sexual imposition, R.C. 2907.05(A)(3). *Id.,* 36 Ohio App.3d at 250, 523 N.E.2d at 326. However, that section prohibits "sexual contact," which, as defined in R.C. 2907.01(B), includes a culpability requirement that the state is required to support with evidence sufficient for conviction. We believe that the *Astley* court erroneously analogized the two offenses, which are different in this very important respect. Therefore, we reject the rule stated in *Astley,* and we hold that the trial court erred when it instructed the jury in this case that "the State need not prove the defendant's intent."

These misstatements of law in the trial court's jury instructions were never corrected or modified in any way. Had Mundy's Proposed Instruction No. 3 been given, the error implicit in these other instructions might have been avoided. Those errors deprived Thomas Mundy of a fair trial because they clearly relieved the state of its burden of proving one of the essential elements of the offense charged here—that in touching these victims as he did, this particular defendant, Thomas Mundy, had a purpose or specific intention of sexually arousing or gratifying either himself or the victims. Regrettably for the victims, Mundy's convictions must be reversed and this case remanded for a new trial. The first assignment of error is sustained, in part.

## II

"This court should reverse because the indictment and bill of particulars were too expansive and deprived appellant of a fair and reasonable opportunity to prepare his defense."

Mundy argues that he was deprived of a fair trial and due process of law because the indictment and bill of particulars in this case averred that the alleged offenses occurred during broadly specified periods.

The fourteen separate offenses charged in this case involved the sexual abuse of three children of tender years, which occurred repeatedly over an extended period of time. The indictment and bill of particulars furnished by the state specified that the intervals during which these various offenses occurred ranged from a low of one year on count six to a maximum of just over five years on counts seven through eleven. At the conclusion of its case-in-chief, the state was permitted to amend the indictment and bill of particulars as to the specified intervals for some of these offenses. After amendment, the interval specified for some of these offenses increased to just over eight years.

Mundy was charged with fourteen separate violations of R.C. 2907.05(A)(4). The precise date and time of the offense are not essential elements of that crime. *State v. Barnecut* (1988), 44 Ohio App.3d 149, 542 N.E.2d 353. Thus, a certain degree of inexactitude in averring the date of the offense is not *per se* impermissible or fatal to the prosecution. *State v. Sellards* (1985), 17 Ohio St.3d 169, 17 OBR 410, 478 N.E.2d 781; *State v. Lawrinson* (1990), 49 Ohio St.3d 238, 551 N.E.2d 1261. Nevertheless, where an accused requests a bill of particulars, the state must supply specific dates and times for the alleged offense if it possesses that information. *Sellards, supra.* Furthermore, even if the state is unable to supply more specific dates for the offenses because it does not possess such information, the absence of specific dates may yet be fatal to the prosecution if it results in material detriment to the accused's ability to fairly defend himself, as where the accused asserts an alibi or claims that he was indisputably elsewhere during part, but not all, of the interval specified. *Sellards, supra.*

In many cases involving child sexual abuse, the victims are children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time. *Barnecut, supra.* Such is the case here. There is no evidence whatsoever that the state knew of any more specific dates for the offenses than those set out in the indictment. The state was simply unable to supply specific dates when these offenses occurred because it did not have that information.

The only question remaining is whether the state's inability to supply more specific dates and times resulted in material detriment to Mundy's ability to defend himself. Although Mundy argues in conclusory fashion that such is the case, he does not demonstrate how he was prejudiced by the lack of specific dates. At trial Mundy did not file a notice of his intention to rely on alibi. *Sellards, supra.* Further, Mundy did not claim at trial that he was indisputably

elsewhere during part of the time frames specified when some of these offenses allegedly occurred. Instead, Mundy claimed that the alleged improper touching of these victims' genitals never happened and that the incidents recounted by these victims were the product of "coaching" by various family members and law enforcement personnel. In the alternative, Mundy claimed that if these things did happen they must have happened at times when Mundy was drinking heavily and had no intention of engaging in "sexual contact." Mundy acknowledged at trial that these victims frequently spent weekends with him at his residence where all but two of the offenses allegedly occurred.

Under the particular facts and circumstances of this case, paragraph one of the syllabus from *Barnecut, supra,* is instructive:

"A defendant is not prejudiced by the failure of the indictment to specify the dates and times upon which the charged offenses allegedly occurred if such failure does not impose a material detriment to the preparation of his defense. Where the defendant does not present an alibi defense, where he concedes being alone with the victims of the alleged sex offenses at various times throughout the relevant time frame, and where his defense is that the alleged touchings never happened, the inexactitude of dates or times in the indictment is not prejudicial error."

Mundy has failed to demonstrate any material detriment to his ability to defend himself resulting from the inexactitude of the dates and times these offenses were committed. Accordingly, the failure of the state to supply more specific dates did not deprive Mundy of a fair trial or due process of law. Mundy's second assignment of error is overruled.

### III

"The trial court committed prejudicial error when it failed to excuse for cause jurors who could not be fair or impartial."

Mundy complains about the trial court's refusal to grant his request to remove for cause two jurors who, he claimed, were subject to the influence of bias and prejudice.

Challenges to prospective jurors for cause are governed by Crim.R. 24, which provides, *inter alia:*

"A person called as a juror may be challenged for the following causes:

" * * *

"(9) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt

or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial."

A trial court's ruling on a challenge for cause will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576.

During voir dire two prospective jurors indicated that they had been victims of sexual abuse as children at the hands of their family members. Believing that those two jurors would have substantial emotional involvement with the facts and nature of this case that would adversely affect their impartiality and cause them to identify with the victims and against defendant, counsel for Thomas Mundy challenged these jurors for cause. Based upon the jurors' demeanor and their answers to questions put to them by the court and the parties, the trial court determined that the two jurors could be fair and impartial and overruled Mundy's challenges for cause.

Mundy subsequently exhausted his peremptory challenges without having utilized his peremptory challenges to remove either one of the two jurors he had challenged for cause. The two jurors in question were in fact seated on Mundy's jury and, following voir dire, Mundy renewed his challenge to them via a motion for a mistrial, which the trial court overruled.

Mundy cites *State v. Zerla* (Mar. 17, 1992), Franklin App. No. 91AP–562, unreported, 1992 WL 55433, to support his argument that the trial court should have removed for cause the two jurors in question here. In *Zerla,* a rape case, the court of appeals held that the trial court abused its discretion in refusing to remove for cause a juror who had been raped three years earlier.

Unlike *Zerla,* however, the sexual assault of the two prospective jurors in this case was not of recent origin, and the prospective jurors here were not at the time of this trial receiving counseling for their assault or otherwise still actively engaged in the process of recovering from their experience. It is evident from this record that the sexual abuse of the two prospective jurors here occurred many years ago, and that experience no longer actively influenced their lives.

Mundy further asserts that the trial court improperly rehabilitated the two jurors through leading questions that implied that the jurors were expected to say that they could put their personal experiences behind them and be fair and impartial. In *State v. Leavell* (Apr. 7, 1989), Montgomery App. No. 10919, unreported, 1989 WL 33104, we observed:

"Trial judges often, wittingly or unwittingly, exert considerable influence upon jurors, who, due to the nature of their role in the courtroom, can be expected to pick up their cues from the trial judge concerning how they should behave. Trial

judges may certainly conduct voir dire; a trial judge may interrogate a perspective juror in order better to ascertain whether he is actually biased and prejudiced, and the trial judge may clear up any misconceptions that the prospective juror may have concerning his role and duties as a juror. However, a trial judge must be careful not to cross the fine line between: (i) a trial judge's voir dire that merely explores what the prospective juror is really saying about his inability or ability to try the issues fairly and impartially, or that clears up any misconception that the prospective juror may have as to his proper role and duties, on the one hand and, on the other hand, (ii) a voir dire by the trial judge that communicates to the prospective juror that what the judge wants and expects the prospective juror to say is that he will put aside any bias and prejudice, and try the issues fairly and impartially. Because of the pervasive influence that a trial judge can ordinarily be expected to have on the behavior of jurors, as the expert, neutral embodiment of justice in an adversary process with which the juror ordinarily will be unfamiliar, the latter kind of voir dire by a trial judge is not sufficient to rehabilitate a prospective juror who has already undermined confidence in his ability to try the issues fairly and impartially, to the extent that he should be excused for cause."

We have examined the record of the voir dire and the questioning of these two jurors by the court and the respective parties as well. We conclude that on the particular facts of this case the trial judge did not impermissibly cross over that "fine line" we referred to in *Leavell.*

One of the two jurors in question here initially expressed concern over her ability to be fair because of her prior personal experience with child abuse and her views on that subject. The other juror never indicated any concern over her ability to be fair and impartial. Both jurors indicated that their personal experience with abuse they had suffered as a child was no longer a problem in their lives, that they rarely even think about it, and that they could set that personal experience aside and decide the only issue in this case, Mundy's guilt or innocence, fairly and impartially based upon the evidence presented to them.

In ruling on Mundy's challenge for cause the trial court was required to assess the credibility of these two jurors. On the state of this record we do not believe it was unrealistic for the trial court to believe that these two jurors could be fair and impartial. While the trial court could have resolved any doubt about impartiality by excusing these jurors for cause, its failure to do so does not rise to the level of an "abuse of discretion" as that term is defined by Ohio law. See *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. This assignment of error is overruled.

## IV

"The court should reverse because of prosecutorial misconduct during trial opening statement and closing argument."

### A. *Closing Argument*

#### 1. *Attacking defense counsel and the effectiveness of the defense.*

The prosecution is ordinarily entitled to a certain degree of latitude in closing argument. *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. The test for prosecutorial misconduct in closing argument is whether the remarks made were improper and, if so, whether they prejudicially affected substantial rights of the accused. *Id.*

Mundy first complains that during the rebuttal portion of her closing argument the prosecutor attacked the sufficiency of the defense presented in this case. We have examined the remarks about which Mundy now complains. Essentially the prosecutor stated that she did not understand the defense presented in this case. Mundy did not timely object to those remarks. Accordingly, the error, if any, has been waived by Mundy's failure to object, unless that error rises to the level of "plain error." *State v. Wickline* (1990), 50 Ohio St.3d 114, 552 N.E.2d 913. Plain error does not exist unless it can be said that but for the error the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804; *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332.

The prosecutor's remarks were a comment upon the evidence presented by the defense in this case. There is nothing improper about the prosecution's pointing out weaknesses or inconsistencies in defendant's theory of the case. We see no error, much less plain error, in these remarks.

Mundy next complains that the prosecutor attacked defense counsel, personally, during the rebuttal portion of closing argument. The prosecutor stated that in reflecting upon what defense counsel had said in his closing argument, it was apparent that defense counsel did not like the prosecuting attorney or the manner in which she prosecuted her cases. Defense counsel objected to this remark, and the trial court sustained that objection. Subsequently, the prosecutor stated:

"Accusations of this prodding and this coaching are ridiculous. I wasn't going to say anything at first about the accusations against myself and Detective Sprude and the implication that we, with all the crime in Montgomery County, would have the time or the inclination to even attempt to falsely prosecute an innocent man. That's ridiculous. Mr. Brannon's accusations are personally

offensive, they are professionally offensive, but more than that, ladies and gentlemen, I submit to you, they are an act of desperation. And that's because he simply has no defense.

"And the fact of that desperation was never more evident in how he attacks the integrity, the honesty and the professionalism of Dr. Greg Ramey and Dr. Sarah Fillingame of the Children's Medical Center. No one from the prosecutor's office went to Children's Medical Center and hired those professionals to testify on behalf of the State. They get paid their salary from Children's Medical Center. They find the kids are abused or they don't find the kids are abused.

"And I submit to you that had they conducted their evaluation and had they independently concluded that the child—that the children had not been abused as they have in the past in other cases, that Dr. Ramey and Dr. Fillingame would then be very highly regarded by the defense in this case."

 Once again Mundy failed to object to the prosecutor's comments. Accordingly, our review is limited to the plain error standard.

Throughout this trial, Mundy's defense was, in part, that he never touched these young children in an improper sexual manner, and that these alleged victims had been coached or prodded into making false accusations against him by family members, counselors and therapists, police, prosecutors, and others. Defense counsel continued this theory of the case in his closing argument.

The prosecutor's comments about which Mundy now complains were, in part, a response to Mundy's claim that these young victims were prodded into making false allegations against him. To the extent that the prosecutor's comments simply emphasize the weaknesses in Mundy's theory of this case, they are not at all improper. To the extent that those comments characterize the *conduct* of defense counsel and his allegations of prodding as personally and professionally offensive, such statements complain about matters, the prosecuting attorney's own personal or professional standards of conduct, that are irrelevant to the issues of guilt or innocence of the accused. However, in their content they are not so unfairly derogatory as to constitute incurable or flagrant misconduct such as, for example, suborning perjury. Cf. *State v. Smith, supra.*

These comments simply do not rise to the level of misconduct which may have deprived Mundy of a fair trial. We see no plain error here.

2. *Accusing the defense's expert of "prostituting himself."*

 As part of his defense in this case Mundy presented testimony from Dr. Lee Coleman, a California psychiatrist. Coleman's testimony was designed to cast doubt upon the validity of the conclusions reached by Dr. Fillingame and Dr. Ramey, the state's witnesses, that these victims had been sexually abused, by

challenging the methods and techniques used by Fillingame and Ramey to interview and evaluate these victims. During closing argument defense counsel commented about why the conclusions reached by Fillingame and Ramey were unreliable vis-a-vis Dr. Coleman's testimony. During her rebuttal closing argument the prosecutor stated:

"Now, as far as I think and as far as I've ever known, you are the judges of the reliability, of the degree of reliability and credibility of their testimony and yet we have this man, this psychiatrist, who flies all the way from Berkeley, California and gets paid handsomely to criticize two dedicated and devoted professionals in one of the best children's medical centers around.

"Lee Coleman says that these qualified professionals can not come into a courtroom and explain to you how they've developed through their expertise, through their education and training, the ability to evaluate children and to render an opinion as to whether or not they have been sexually abused. Yet, it's okay for Dr. Coleman to prostitute himself by flying all the way across the country to testify against his colleagues.

"MR. BRANNON: Object and move for a mistrial based on that comment. That's an inappropriate comment on an expert and I have a case citation if you would like.

"THE COURT: I don't believe it's inappropriate. It's overruled.

"MS. FRYDMAN: Where does this doctor get his expertise? You know, we've heard a lot about his training; he went to medical school and did a residency in psychiatry. But, you know what? What did that have to do with anything, anything that he testified to?

"In his psychiatric residency, he was taught how to evaluate the mentally ill and how to properly treat and care for them. That's not what he does. That's not what he has chosen to do with his career. His career is watching videotapes that the defense has provided to him and who defense lawyers pay for him to review. I submit to you, ladies and gentlemen, that Dr. Coleman's medical degree is as much of a use to him in his testimony as my law degree is to raising my children.

"He tells you, you know, the interview techniques in this case were bad because you don't have tapes. Well, then you can't know if they were good either, can you, Doctor? Well, I can assume that they weren't good because I've read the transcript of testimony of the children. Well, excuse me, but I thought that was the job of the jury in this case. And that is the job of the jury in this action.

"And yet that man had the nerve to come in here and say that the interview techniques were improper? He never saw the interviews, he never reviewed a videotape of them. He never heard an audiotape of this testimony. And you

know what's even more significant? He never even tried to contact the people who conducted the interviews. Don't you think that if he was making a good faith attempt to determine the truth and the reliability about this process that he would have contacted all these different people who interviewed these children and try to find out what their techniques were?"

The prosecutor's comment that Dr. Coleman was "prostituting himself" was improper to the extent it implies dishonesty or that Coleman tailors his testimony to suit the needs of the party procuring his services without regard to his true professional judgment. We caution the state against the use of such references as a means of challenging the evidence presented or the credibility of the witnesses who testify. Inflammatory attacks by the state's counsel have no place in a fair trial and in another instance may present reversible error.

When this objectionable comment is viewed in the context of the prosecutor's entire closing argument as it relates to Dr. Coleman, however, these concerns recede. The prosecutor was attempting to point out to the jury weaknesses in Coleman's assessment of Fillingame and Ramey's work with these victims by showing that Coleman did not have sufficient information to reach any conclusions about the reliability of the interviews conducted by Ramey and Fillingame. When viewed in its proper context, the prosecutor's single improper comment impugning the character of this defense witness is simply not so egregious, in our opinion, as to deprive Mundy of a fair trial. On this record as a whole we are simply unable to say that the prosecutor's remark may have affected the outcome of this trial.

3. *Personal remarks about witness credibility and guilt of the accused.*

Mundy argues that the prosecutor during her closing argument improperly expressed to the jury her personal opinion about Mundy's guilt and the credibility of certain witnesses. *State v. Smith, supra.* We have examined the record references to which Mundy directs our attention as being exemplary of this claimed error. We note that some of those references have little to do with Mundy's claim about the prosecutor expressing her personal opinion on guilt and witness credibility. Instead, they appear to involve issues which in large part are raised and argued under other assignments of error, and to the extent that we have addressed those issues in other parts of this opinion, we will not address them here.

Returning to those record references that are pertinent to this particular claimed error, we note that Mundy did not present a timely objection to the remarks about which he now complains. Under those circumstances the error, if any, has been waived, unless it rises to the level of "plain error."

While it is improper for the prosecutor to express to the jury his or her personal opinion about the credibility of any witness, the prosecutor is permitted to make fair comment on the credibility of witnesses based upon their testimony in open court. In those circumstances the jury is not being invited to go beyond the evidence presented in court. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772.

We have reviewed the remarks about which Mundy complains in the context of the prosecutor's entire closing argument. We find no instance where the prosecutor offered her personal opinion about the credibility of any witness.

In commenting upon the evaluations of the victims in this case by the state's two expert witnesses, Dr. Fillingame and Dr. Ramey, the prosecutor did not express her personal opinion about the credibility of these witnesses. The prosecutor made reference to the credibility of the victims in this case, but only in relation to their testimony in court and in the context of explaining to the jury the defense strategy behind presenting evidence of Mundy's drinking problem.

Nor do we find any incidents in which the prosecutor offered her personal opinion about Mundy's guilt. Her comments to the jury that Mundy's drinking and intoxication were not a defense to the crimes Mundy was charged with and that it was irrelevant whether other family members felt that Mundy's intoxication might excuse his sexual fondling of his grandchildren are simply not equivalent to expressing a personal opinion that Mundy was guilty. Furthermore, we do not agree with Mundy that the prosecutor unfairly appealed to the jury to base its decision upon sympathy for these victims or invited the jury to go beyond the evidence presented by stating:

"I submit to you, that I agree with one thing that Mr. Brannon said, and that is the innocent must be protected. And that is why we have laws against child sexual abuse in this state and every state in our union.

"I'm not saying that, ladies and gentlemen, because I'm asking for your sympathy. There is no room for sympathy in a court of law. Time for sympathy was back in the bedroom when they were begging him to stop touching them.

"The time now in this courtroom is for justice. Those children deserve justice, the people of the State of Ohio deserve justice. And I am confident that with your verdict, justice will be served and that you will find this defendant guilty beyond a reasonable doubt. Thank you. Thank you."

Each of the victims in this case testified about the various measures they took to stop Mundy's repeated fondling of their sex organs, including pushing his hands away, wearing their street clothes to bed, and sleeping together as a group. Furthermore, the trial court instructed the jury that the arguments of counsel

were not evidence and that they, the jury, were not to be influenced by any considerations of sympathy.

▆ We do note one incident which arose, not during the prosecutor's closing argument, but during cross-examination of defense witness Rita Mundy. During discussion of defense counsel's objection that the prosecutor was not allowing this witness to finish her answers to the questions, defense counsel suggested that the prosecutor should just let this witness tell the truth. The prosecutor responded, "I wish she would." This comment, while arguably improper, was not objected to by Mundy. On this record as a whole we cannot say that but for this comment by the prosecutor the outcome of Mundy's trial clearly would have been different. We see no "plain error."

B. *Failure to Disclose Exculpatory Evidence*

▆ Mundy contends that the prosecutor failed to provide him with exculpatory evidence, a psychological report on one of the victims in this case, David Lee Mundy. The report had been prepared by a counselor at Positive Focus, who concluded that David had not been sexually abused. According to defendant Mundy, he was alerted to the existence of this evidence during his cross-examination of one of the state's witnesses at trial. The record, however, does not support this assertion, and further does not support a finding that the prosecutor violated discovery rules, Crim.R. 16, or the *Brady* rule. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

As part of his pretrial discovery requests pursuant to Crim.R. 16, Mundy sought any and all exculpatory evidence and any psychological reports or evaluations done on the three victims in this case. On May 25, 1993, the trial court filed an entry which provided in part:

## "I. MOTION TO COMPEL

"The Defendant has requested all psychological and psychiatric records concerning the alleged victims. In response the State has submitted two written reports which were received after consents to release were executed by persons with authority to do so. A third report has been requested (but same as of 4/28/93, had not been received by the State) and the State acknowledges that same is due Defendant upon the State's receipt of same.

"Defendant is clearly entitled to said reports as long as same can be procured with due diligence by the State. The State appears to agree. The State is ordered to deliver to defense counsel any such reports that are in the possession of the State or that can be obtained with due diligence. The court will not allow use of said reports if this order is not honored."

The state presented during its case-in-chief the testimony of a psychologist, Dr. Sarah Fillingame, who had examined some of the victims in this case. During Mundy's cross-examination of Dr. Fillingame concerning the victims, the following colloquy took place:

"Q. Do you know if David had been someplace else?

"A. Yes.

"Q. He had been to Positive Focus?

"A. Yes.

"Q. And there had been a conclusion that he had not been sexually abused, there?

"A. Yes."

Mundy subsequently moved for a mistrial, in part because he had not been provided with the report from Positive Focus in spite of his discovery requests for exculpatory evidence and for any psychological reports concerning the victims. The prosecutor responded that the same day she received the report from Positive Focus concerning David Lee Mundy she had faxed a copy to defense counsel's office. The prosecutor subsequently hand-delivered a copy of that report to defense counsel when the latter indicated he had not received the fax. The trial court overruled Mundy's motion for a mistrial.

From our review of this record, it is clear that defense counsel was well aware of the existence of this exculpatory evidence before trial commenced. See Mundy's motion to dismiss indictment filed May 25, 1993; motion to dismiss filed June 4, 1993. See, also, Mundy's opening statement at trial. Clearly, the existence of this evidence did not surprise Mundy at trial. Furthermore, the prosecutor represented to the trial court that she turned over to defense counsel the report from Positive Focus containing this exculpatory evidence as soon as she received it, and there is nothing in this record which refutes that representation. No violation of the discovery rules has been demonstrated on this record. The trial court did not abuse its discretion in denying Mundy's request for a mistrial.

## C. *Use of False Evidence*

 Mundy complains about the admission of certain testimony by a state's witness, which Mundy contends concerned his reputation for sexual activity which the state's witness knew was totally false.

Cynthia Sprude, a Montgomery County deputy sheriff, testified concerning her investigation of the charges against Mundy in this case. As part of her investigation, after she interviewed the victims, Sprude interviewed Mundy in the

presence of his attorney. While Sprude was testifying at trial about her interview with Mundy, the following exchange took place:

"Q. What is the first thing you did after advising the defendant of his Constitutional rights?

"A. I let his attorney, Mr. Brannon, read the notes that I had taken from the gentleman's [children's] interviews.

"Q. Did Mr. Brannon read these notes aloud to the defendant and to everyone in the room, or to himself?

"A. To himself.

"Q. Can you tell us whether or not at that time—what happened at that time as Mr. Brannon was reading the notes?

"A. He was just disgusted with the notes and making comments about them, how they were ridiculous.

"Q. Can you tell us whether or not Mr. Brannon expressed these opinions in front of the defendant?

"A. Yes, he did.

"Q. And did Mr. Brannon make any other comments about the truth or falsity of the allegations made by the children, in front of his client?

"A. Yes, he did. He said he has known the defendant for many years and he knows he would never do that. He informed me that the defendant was a slut and he could have any woman he wants. He didn't have to molest children.

"Q. Were those comments made in front of the defendant?

"A. Yes, they were."

Mundy made no objection to the foregoing testimony of Sprude. The following day, Mundy moved for a mistrial, arguing that Sprude's testimony that Mundy's counsel had called Mundy a "slut" violated the rape shield law, R.C. 2907.05, and the "other acts" provisions of R.C. 2945.59 and Evid.R. 404(B). The trial court subsequently overruled Mundy's motion for a mistrial.

 Mundy did not make a timely objection to the portions of Sprude's testimony about which he now complains. Accordingly, the error, if any, has been waived by Mundy's failure to object unless that error rises to the level of "plain error." *State v. Wickline, supra.*

We note that the reference to Mundy as a "slut" did not arise as a direct result of the prosecutor's attempt to prove Mundy's bad character or demonstrate his reputation for sexual activity. Rather, according to the testimony, this characterization of Mundy was first brought up by defense counsel, on Mundy's behalf,

during Sprude's investigation of this case, in an apparent attempt to explain why Mundy was not guilty of the allegations that he had sexually molested his grandchildren. More importantly, whether defense counsel did or did not use the term "slut" when describing Mundy during Sprude's interview with Mundy, and whether or not that term accurately describes Mundy's sexual behavior, is immaterial to Mundy's guilt or innocence in this case. In instructing the jury in this case the trial court cautioned them as follows:

"Now, during the course of this trial, certain improper remarks and alleged information was presented as evidence. These matters cannot be considered by you at all. They must be totally absent from your mind and be considered specifically unalleged and unproven as a matter of law. The Court, therefore, instructs you to totally disregard all matters concerning Defendant's sex life, his wife's access or inaccess to him, any affairs, marital affairs or anything related to that. Further, any statement attributed to the Defendant's attorney about Defendant, his sex life, or his attitude about Defendant's relationship or ability with women should not be considered for any purpose now, in deliberations, or as any part of your consideration ever."

When viewed in the context of this record as a whole, Sprude's testimony that Mundy's attorney referred to Mundy as a "slut" did not deprive Mundy of a fair trial. We cannot say that but for this testimony the outcome of Mundy's trial *clearly* would have been different.

## D. *Prosecutorial Coaching of Witnesses*

▆▆▆ Mundy contends that he was deprived of a fair trial because the testimony of the child-victims in this case was not the product of their own personal knowledge, but was the product of "coaching" by various persons.

A review of the trial record demonstrates that Mundy aggressively challenged the testimony by his accusers in this case, his own grandchildren, in an effort to demonstrate that various adult family members as well as law enforcement officials had convinced these children through repeated coaching and indoctrination that Mundy had touched them in a sexual manner when, in fact, nothing of that nature had occurred. Ultimately, however, the extent to which these victim-witnesses were "coached" and the influence such may have had upon their testimony involves the question of credibility, an issue for the jury as trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The jury apparently did so. We see no reversible error.

Mundy's fourth assignment of error is overruled.

## V

"This court should reverse because the trial court improperly admitted evidence prohibited by R.C. 2907.05(D), 2945.59, and Evid.R. 404(B)."

Mundy complains that the state improperly introduced evidence concerning his past sexual activity that did not involve the victims or charges at issue in this case. According to Mundy this violated the rape shield law, R.C. 2907.05(D), and the "other acts" provisions of R.C. 2945.59 and Evid.R. 404(B).

 First, Mundy asserts that the state improperly introduced evidence of uncharged misconduct vis-a-vis an allegation that Mundy had sexually abused yet another one of his grandchildren, Danielle, similar to the way he allegedly abused the victims in this case, even though Mundy was never charged in this case with any misconduct involving Danielle.

A review of the trial record, however, reveals that it was not the state, but rather Mundy himself, who elicited this evidence concerning Danielle. During Mundy's cross-examination of Tommy, one of the victims in this case, the following exchange took place:

"By Mr. Brannon:

"Q. Your—you have a step-sister named Danielle, do you not?

"A. Yes.

"Q. And I think she's 17 now?

"A. Yes.

"Q. Did Daniel [*sic*] ever spend any time with you and Jennifer over at Pappaw's house?

"A. Yes.

"Q. Did she ever sleep with you and Jennifer, for example?

"A. I don't remember.

"Q. When she'd go over to Papaw's house with you and Jennifer, where's she sleep?

"A. I don't know.

"Q. Danielle ever made any complaints about Pappaw doing anything or anything inappropriate?

"Did Danielle?

"A. Yes.

"Q. She did?

"A. Yes.

"Q. And when did she make those complaints?

"A. Just a couple days ago."

It is evident from this record that Mundy himself deliberately elicited the very evidence about which he now complains. Accordingly, Mundy will not be allowed to take advantage during his appeal of an error which he induced or invited. *State v. Seiber* (1990), 56 Ohio St.3d 4, 564 N.E.2d 408. Moreover, we note that the trial court specifically instructed the jury to disregard any comment about alleged abuse involving Danielle. We must assume that the jurors followed that instruction.

■ Mundy further complains in this assignment of error that the state improperly introduced evidence concerning his sex life. Cynthia Sprude, the investigating police officer in this case, testified on direct examination that during her interview with Mundy he told her that he rarely had sex with his wife, and that he and his sons had discussed his extramarital affairs. Once again, Mundy alleges that the admission of this type of evidence violates R.C. 2907.05(D) and Evid.R. 404(B).

Mundy did not register a timely objection at trial to the testimony by Det. Sprude about which he now complains. In fact, on cross-examination Mundy further questioned Det. Sprude about his statements to her about not having sex with his wife and his extramarital affairs. It was not until the following day that Mundy moved for a mistrial based upon this evidence. The trial court denied Mundy's mistrial request, but subsequently cautioned the jurors that they could not consider this particular evidence for any purpose.

■ Mundy's failure to timely object at trial to testimony regarding his statements relative to his extramarital affairs and having sex with his wife deprived the trial court of an opportunity to timely correct any error. Thus, this evidence must be examined utilizing a "plain error" standard. *Wickline, supra.* When viewed in the context of this trial record as a whole, including the fact that the trial court ultimately excluded this evidence via its cautionary instructions to the jurors that they must not consider this particular evidence for any purpose whatsoever, an instruction which we must presume the jurors understood and followed, we cannot say that but for this testimony Mundy *clearly* would have been acquitted. In other words, we see no plain error. This assignment of error is overruled.

## VI

"This court should reverse because the state's experts testified the children were truthful in their statements in violation of *State v. Boston* (1989), 46 Ohio St.3d 108 [545 N.E.2d 1220]."

Mundy complains that in their testimony in this case the state's expert witnesses, in effect, declared that the child-victims were truthful, in violation of the rule set forth in *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220. We agree, but find that this error does not rise to the level of "plain error."

In *State v. Boston, supra,* a child sex abuse case, an expert witness for the state testified that the victim had not fantasized her abuse and had not been programmed to make the abuse allegations. The Supreme Court concluded that the expert witness had, in effect, declared that the victim was truthful. Because in our system of justice it is the trier of fact and not witnesses, either lay or expert, who are charged with the burden of assessing credibility and veracity, the Supreme Court found that the admission of this testimony by the state's expert invaded the province of the fact-finder and constituted egregious, reversible error. The court held:

"An expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston, supra,* at syllabus.

As part of its case-in-chief, the state presented two child psychologists who had examined the victims. In the course of testifying about the victims, Dr. Sarah Fillingame made the following statements:

"These are the kinds of details that children who have not actually been abused do not provide, okay?"

"There was no reason for her to be talking about this and saying that if she had not been abused.

" * * * you're suggesting coaching or that this is being put in their minds by a family member. What's very clear to me and has always been very clear to me is that Jennifer and David, neither one, they're not receptive to that kind of thing. They desire very badly—very much to protect their grandfather; they don't want to see their grandfather hurt."

"They're not susceptible to a subtle insinuation and then to take off and create a story based on that and tell a story."

Similarly, in testifying about these victims Dr. Gregory Ramey stated:

"That is not the kind of answer you're going to get from a child who is making something up.

"The only thing I would say to you is if you know Tommy Mundy, he's not the kind of kid who can be coached, believe me."

"Q. He can't be influenced or coached?

"A. Everyone of us can be influenced. Can Tommy be coached on something like this? No."

"I cannot come to any other conclusion but that this young man is being honest with me because I can find no reason for fabrication. Coaching can't do that for Tommy."

While neither Dr. Fillingame nor Dr. Ramey expressly testified that in their opinion the victims in this case were telling the truth, that is nevertheless the clear and obvious meaning of their above-quoted statements. Such evidence violates the rule of *State v. Boston, supra,* and its admission in this case constitutes error. Mundy, however, did not register a timely objection at trial to this improper testimony by Fillingame and Ramey. Accordingly, we must examine the erroneous admission of this evidence utilizing a "plain error" standard of review. *Wickline, supra.* In order to find the existence of plain error, we must be able to conclude that but for the admission of this improper evidence, the outcome of Mundy's trial *clearly* would have been otherwise. *Long, supra; Underwood, supra.*

On the state of this record as a whole, we are unable to say that but for these statements by Fillingame and Ramey, which in effect declared that these victims were truthful, Mundy *clearly* would have been acquitted of these charges. In other words, the admission of this evidence, although improper, does not rise to the level of plain error. This assignment of error is overruled.

## VII

"The court committed prejudicial error and abused its discretion in permitting the state to amend the indictment and bill of particulars, its treatment of voluntary intoxication, its denial of defense recross-examination, and its repeated comments about the trial length."

### A

*Abuse of discretion under Crim.R. 7(D)*

This complaint relates back to Mundy's second assignment of error and involves the broadly specified periods during which these offenses allegedly had occurred and the inexactitude in the state's averment of the date of these offenses. Specifically, Mundy asserts here that the trial court abused its discretion in allowing the state to amend the indictment and bill of particulars by expanding the specified time frames of these offenses.

At the conclusion of its case-in-chief, the state moved to amend the indictment and bill of particulars to conform to the evidence by expanding the specified time frames during which the offenses set forth in counts two through six occurred. The trial court, relying upon Crim.R. 7(D), granted the requested amendment. The trial court denied Mundy's requests for discharge of the jury and for a

continuance, finding that Mundy had not been misled or prejudiced by the amendment.

Crim.R. 7(D) clearly authorized the trial court to amend the indictment as it did in this case:

"The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impanelled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. Where a jury is discharged under this division, jeopardy shall not attach to the offense charged in the amended indictment, information, or complaint. No action of the court in refusing a continuance or postponement under this division is reviewable except after motion to grant a new trial therefor is refused by the trial court, and no appeal based upon such action of the court shall be sustained, nor reversal had unless, from consideration of the whole proceedings, the reviewing court finds that a failure of justice resulted."

Mundy argues that allowing the state to further expand the already broad time frames during which these offenses allegedly occurred hampered the preparation of his defense. Mundy does not demonstrate however how or why his defense was impaired.

Mundy's defense at trial was not alibi. Mundy never claimed that he was indisputably elsewhere during part of the time frames specified for some of these offenses. Rather, Mundy acknowledged that these victims frequently spent time with him at his home, particularly on the weekends, and Mundy simply claimed that the alleged improper touching of these victims never happened; that the incidents recounted by these victims were the product of "coaching" by various family members, counselors, therapists, police officers, prosecutors, and other government agency personnel.

Having failed to demonstrate how the preparation of his defense was hampered or how he was prejudiced by the amendment to the indictment, Mundy has not shown an abuse of discretion on the part of the trial court, or a failure of justice, in permitting these amendments.

## B

### *Voluntary Intoxication*

 Thomas Mundy argues that the trial court committed prejudicial error in not allowing him to utilize voluntary intoxication to negate the specific intent element of R.C. 2907.05(A)(4).

As discussed in Mundy's first assignment of error, R.C. 2907.05(A)(4) requires a purpose or specific intent on the part of an accused who touches the erogenous zone of another to produce sexual arousal or gratification in either the accused or the victim. The state is required to prove not only the *actus reas*, the touching of the erogenous zone, but also the *mens rea*, or bad purpose involved; that the touching was for the purpose of sexually arousing or gratifying either the accused or the victim.

 The general rule is that voluntary intoxication is not a defense to or an excuse for a crime. However, an exception exists where specific intent is a necessary element of the offense charged. In those cases, if the intoxication is such as to preclude formation of the specific intent, then the fact of intoxication may be shown to negate the specific intent element of the offense. *State v. Fox* (1981), 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410; *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443. Whether the evidence presented in a particular case is sufficient to require a jury instruction on intoxication is a matter for the sound discretion of the trial court. *Wolons, supra.*

Thomas Mundy argued during the trial that specific intent was a necessary element of R.C. 2907.05(A)(4) and that his voluntary intoxication during the events in question was available as a defense to the extent that his intoxication precluded him from forming the specific intent required for commission of this offense. Mundy timely filed a written request for a jury instruction on intoxication. See 4 Ohio Jury Instructions (1993), Section 411.10.

Considerable evidence was presented that Thomas Mundy drank heavily and that at the times these offenses allegedly occurred Mundy was drunk. Some of this evidence came from the victims themselves. There was also evidence that when Thomas Mundy drank heavily, he was a different person who would do things he did not ordinarily do; and that he would sometimes lose control and not know or realize what he was doing. Thomas Mundy himself, although consistently denying throughout these proceedings that he ever touched the erogenous zones of these victims or that he remembered any such conduct on his part, nevertheless testified that "if it happened, it had to happen while I was drinking," and that there was never any intention on his part to touch these victims in a sexual manner for sexual gratification.

During the trial the court adhered to its view that R.C. 2907.05(A)(4) is a strict liability offense, that specific intent is not an element of this crime that the state must prove, and, therefore, that evidence of Mundy's voluntary intoxication was not available to demonstrate that Mundy did not have the requisite intent. Accordingly, the court at various times excluded evidence relevant to Mundy's purpose or specific intent and refused to give Mundy's requested jury instruction on intoxication.

However, as we have already found, in order to convict Mundy of violating R.C. 2907.05(A)(4), the state was required to prove that in touching these victims as he did, Mundy had the purpose or specific intention to sexually arouse or gratify himself or the victims. Thus, Mundy was legally entitled to present evidence that he was intoxicated during these events, to the extent that intoxication could have affected his ability to form the purpose or specific intent required for commission of this offense. On the state of the record before us, Mundy was also entitled to his requested Jury Instruction No. 4 on intoxication, as the evidence warranted such an instruction.

Instead of giving Mundy's requested instruction on intoxication, which closely resembles the pattern instruction found in 4 Ohio Jury Instructions, Section 411.10, the trial court gave the instruction quoted above.

The trial court's instruction on intoxication was incomplete, misleading, and an incorrect statement of the law. The court misstated the law by advising the jury that the state was not obligated to prove Mundy's intent, though specific intent is an essential element of the crime charged, as we found with respect to the same issue in the first assignment of error. The court's erroneous instruction relieved the state of its burden of proving all essential element of this offense.

The court deprived Mundy of a legally available defense in this case, intoxication, by not completely instructing the jury on intoxication. Such an instruction would state that if the jury found that Mundy had established by a preponderance or greater weight of the evidence that at the time these crimes were committed he was so influenced by alcohol that he was not capable of forming the required purpose or specific intent, then the jury was required to find Mundy not guilty, because purpose or specific intent is an essential element of the offense charged. The trial court abused its discretion in not giving Mundy's requested instruction on intoxication and in instructing the jury as it did.

This portion of Mundy's seventh assignment of error is well taken and will be sustained.

■

## C

### *Recross-examination*

■ Mundy complains that the trial court abused its discretion in not allowing him to recross-examine one of the child-victims in this case, Jennifer Mundy.

■ Whether to afford a party the opportunity to conduct recross-examination is a matter resting within the trial court's sound discretion. *State v. Faulkner* (1978), 56 Ohio St.2d 42, 10 O.O.3d 82, 381 N.E.2d 934.

Thirteen-year-old Jennifer Mundy, one of the victims, was subjected to lengthy direct and cross-examination that kept Jennifer on the witness stand for approximately five hours. During this time, Jennifer was forced to publicly relate various sexual acts perpetrated upon her by her own grandfather. Understandably, the prolonged and thorough examination of Jennifer on these matters subjected Jennifer to considerable stress. Undoubtedly concerned about Jennifer's welfare, the trial court concluded that the parties had been afforded sufficient opportunity to question Jennifer, and the court refused to allow Mundy to recross-examine her.

We have reviewed the direct and cross-examination of this witness and agree with the trial court that it was extensive and sufficient. Mundy argues, however, that the trial court abused its discretion in not allowing him to recross-examine Jennifer because the state had introduced "new matters" during its redirect examination of this witness. We disagree.

Mundy's strategy at trial was to demonstrate that the incidents of improper sexual contact or touching recounted by these victims never happened, and that those things had been implanted in the minds of these victims as a result of "coaching" by family members, counselors and therapists, police officers, prosecutors, children's services workers, and others. The issues which Mundy claims he had a right to explore with Jennifer on recross-examination are, for the most part, matters involving Jennifer's credibility, an issue which could have been, and was, extensively explored during cross-examination, including questioning Jennifer about discussions of these events with various family members.

■■ An "abuse of discretion" is more than an error of law or an error in judgment. It is an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. In light of Mundy's thorough cross-examination of this witness, which included attempts to impeach her credibility, we do not believe that the trial court abused its discretion by refusing to allow Mundy to further question this witness on recross-examination in order to further test her credibility.

D

## Comments by the Court

■ Mundy contends that the trial court deprived him of a fair trial by repeatedly commenting, throughout the course of this two week trial, on the fact that this case was dragging on, leaving the jury with the impression that the slow progress of this trial was the fault of defense counsel.

We have examined the specific comments of the court cited by Mundy. Several of them occurred out of the jury's hearing, either in chambers or at side bar. We note that some of the comments with which Mundy takes issue were made in the context of evidentiary rulings, in which the trial court properly excluded hearsay or questions previously asked and answered.

Examination of this record does disclose that at times the trial court voiced impatience with the slow progress of this trial. In that regard, however, we simply note that on several occasions both parties conducted lengthy examinations of some of the witnesses on matters that were tangential, at best, to the critical issues in this case. In expressing displeasure with the slow pace of this trial, the trial court at no time made any comments which in any way implied that Mundy was guilty or expressed the court's view on that subject.

While we do not condone any exhibition of impatience on the part of a trial court in front of the jury that implies that either party is unnecessarily delaying the progress of the trial, on the record before us, when viewed in its entirety, we cannot say that Mundy has demonstrated any prejudice resulting from the court's comments about the pace of this trial.

This assignment of error is sustained in part and overruled in part.

## VIII

"This court should reverse because the verdict was based on insufficient evidence and was against the manifest weight of the evidence."

■ Mundy was convicted of twelve counts of gross sexual imposition in violation of R.C. 2907.05, which provides in pertinent part:

"(A) No person shall have sexual contact with another not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

" * * *

"(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

"Sexual contact" is defined in R.C. 2907.01(B):

" 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female a breast, for the purpose of sexually arousing or gratifying either person."

Mundy was charged in this case with fondling the genitals of his grandchildren. Each of the three victims testified in this case that over a prolonged period of time Mundy repeatedly touched their sex organs and forced them to touch his. These incidents occurred at Mundy's home when the victims would stay overnight, usually on the weekends, between 1983 and 1991, when these victims were young children.

In reviewing either the weight or sufficiency of the evidence supporting a criminal conviction, the same test is applied. Our function is to examine the evidence admitted at trial and to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *Id.* On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. An appellate court abuses its discretion by substituting its judgment for that of the trier of fact as to the credibility of witnesses. *State v. Walker* (1978), 55 Ohio St.2d 208, 9 O.O.3d 152, 378 N.E.2d 1049.

In viewing the evidence presented in this case in a light most favorable to the prosecution, particularly the testimony of the three victims, we conclude that such evidence, if believed, is sufficient to enable a rational trier of fact to find all of the essential elements of the offenses charged proven beyond a reasonable doubt.

This assignment of error is overruled.

## IX

### *Conclusion*

Having sustained appellant Mundy's first assignment of error, in part, and his seventh assignment of error, in part, we will reverse his conviction and remand the case to the trial court for a new trial.

*Judgment accordingly.*

GRADY, P.J., and FREDERICK N. YOUNG, J., concur.

RICHARD K. WILSON, J., retired, of the Second Appellate District, sitting by assignment.