DECISION.
Early one morning Keisha Paige departed for work. She left her three children, Caprice Paige, then six years old, Jessica Paige, then five, and sixteen-month-old Mista Paige, in the care of her boyfriend, defendant-appellant Milo Washington. Before noon, Mista Paige died from head injuries. A jury convicted Washington of Mista's murder after considering conflicting testimony about what had occurred in Paige's apartment that morning. We affirm Washington's conviction.
 I. Washington's Version
Washington has maintained a consistent version of the morning's events. He claims that he heard a thump and went into the children's room to investigate. Upon entering the room, he says that he found Caprice and Jessica quietly watching television, while Mista lay motionless on the floor by his crib. He then says that he noticed blood on the child's head and attempted to treat his injuries, but that Mista's breathing was congested and his eyes were unblinking.
Washington decided that he needed help, so he placed Mista in a stroller and walked to the home of the child's grandmother. But the grandmother was not there. He then sought assistance from various neighbors and ultimately joined a neighbor in transporting Mista to the hospital. Despite the best efforts of the medical personnel, Mista was pronounced dead.
 II. Conflicting Testimony
It was essentially the testimony of two witnesses that contradicted Washington's version of the events that led to Mista's death. First, Dr. Utz, a deputy coroner and forensic pathologist for Hamilton County, testified concerning the autopsy that he had performed on Mista. It was his opinion that Mista had been murdered. Utz based his opinion on the fact that the trauma to Mista's head had been so forceful that the multiple fractures to Mista's skull were not consistent with a fall from a bed. Instead, the fractures were more consistent with the force associated with an automobile accident.
Additionally, Mista had contemporaneously incurred many other less severe injuries. He had a bruise in the center of his forehead, small abrasions around the corner of his right eye, another small abrasion just behind his hairline, a small bruise on the inside of his upper lip, and a small patterned bruise on his right shoulder. The patterned bruise on his right shoulder matched the pattern of a much larger bruise on the right side of his face that indicated the location of the force that had killed Mista by fracturing his skull. The pattern consisted of vertical parallel lines that were consistent with a shoe print.
Thus, according to Dr. Utz, the force of the trauma, the vertical pattern of bruises on Mista's face and shoulder, and the multiple contemporaneous injuries were inconsistent with a single fall from a crib.
Mista's sister Caprice testified that she had been in Mista's room that morning and had seen him standing in his crib and shaking the bed. According to Caprice, Washington had entered the room, spanked Mista, and taken him into another room in the house. The next time she saw Mista, she testified, he was in a stroller and was not moving.
 III. Before Trial
Immediately before trial, Washington requested a continuance to retain counsel. The trial court noted that there had been two prior continuances, and though neither continuance had been at Washington's request, the court found that his request was made solely for purposes of delay. Accordingly, the court denied the motion.
Again before the trial actually commenced, the state indicated that it intended to introduce the testimony of several witnesses who would contradict Washington's version of events. But before those witnesses could testify, Washington's trial counsel objected. He claimed that some of the witnesses should not be allowed to testify because their names had not been given to him in advance and in writing.
The state acknowledged that it had not provided Washington with a complete written witness list, but had instead copied and delivered its entire file for the case, including potential witness names and the expected nature of their testimony. Washington's counsel also agreed that he had received notification by phone seven days before trial that the state intended to call Mista's six-year-old sister, Caprice, as a witness, though her name had not appeared on the state's witness list. The trial court overruled the objection, but agreed to grant Washington a continuance if he could demonstrate that he was "surprised" by a given witness's testimony.
 III. Conviction and Appeal
The jury found Washington guilty of murder. He now raises five assignments of error. Washington claims that (1) the verdict should be overturned because the trial court overruled his objection to the testimony of witnesses not on the state's witness list, or in the alternative failed to grant him a continuance for further preparation; (2) the court erred in not granting him a requested continuance to retain counsel; (3) his trial was unfair because Caprice was coached during her testimony by people in the courtroom; (4) he was denied a fair trial because, during closing argument, the prosecutor made improper remarks about Washington's unemotional demeanor throughout the trial; and (5) his conviction was against the manifest weight of the evidence. For the reasons that follow, we overrule all five of Washington's assignments of error in the order that they have been raised, and we affirm his conviction.
 IV. The Undisclosed Witnesses
The state has acknowledged that it did not provide Washington with its list of witnesses before trial. Instead, the state responds that it had delivered more than was required during pretrial discovery by providing access to its complete file,[1] from which Washington could have inferred whom the state might call. Crim.R. 16(B)(1)(e) requires that, upon the defendant's motion, the court shall order the state to furnish the defendant with a written list of witnesses it intends to call at trial. The rule is not satisfied if the state provides the criminal defendant with its file and invites the defendant to speculate about whom it may call as a witness.[2]
Despite the state's incomplete discovery response, the trial court could still have allowed undisclosed witnesses to testify provided that the record did not demonstrate "(1) a willful violation of the rule, (2) that foreknowledge would have benefited the accused in the preparation of his or her defense, or (3) that the accused was unfairly prejudiced."[3]
A trial court exercises its discretion in deciding whether to admit or exclude relevant evidence.[4] Thus, we review the court's decision here to permit the undisclosed witnesses to testify according to an abuse-of-discretion standard.[5] An abuse of discretion has occurred if a trial court's decision is unsupported by a sound reasoning process.[6]
There is nothing in the record to suggest that the state willfully failed to comply with Washington's discovery demand. To the contrary, the record demonstrates that the prosecutor was engaged in another jury trial and sought to satisfy the discovery request by providing his entire file. Also, Washington's counsel admitted that some phone messages were left regarding whom the state intended to call to the stand. While none of the state's good intentions complied with Crim.R. 16(B)(1)(e), there is no indication that the violation was willful or was perpetrated with an attempt to gain an unfair advantage.
The most damaging testimony to which Washington objects is that of Mista's sister, Caprice. But Washington's trial counsel admitted that he had received a phone message from the prosecutor indicating that Caprice would be called to testify, and that the message had been received seven days before trial. With seven days to prepare for Caprice's testimony and in the absence of any explanation regarding what additional preparation that Washington was unable to complete, we cannot conclude that the trial court abused its discretion by allowing Caprice's testimony.
Finally, the record does not indicate that Washington was unduly prejudiced by admission of the undisclosed testimony, even though the trial court did overrule Washington's request for a continuance. Instead, the court stated that it would reconsider Washington's request for a continuance if Washington could demonstrate that he was unfairly "surprised" by the testimony of any of the undisclosed witnesses. Since Washington did not renew his objection to any of the testimony on this basis, we cannot hold that the court abused its discretion in conditionally overruling Washington's motion for a continuance. Accordingly, Washington's first assignment of error is overruled.
 V. The Motion for a Continuance to Obtain New Counsel
Next Washington maintains that the trial court improperly overruled his motion for a continuance so that he could retain new counsel. Initially, we note that if a defendant has demonstrated "good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict,"[7] then the court's failure to honor a timely request for new counsel would constitute a denial of effective assistance of counsel.[8] Otherwise, the court's decision regarding such a motion is governed by an abuse-of-discretion standard.[9] And in exercising that discretion, the court should attempt to balance the defendant's rights and any potential prejudice to him against the public's interest in the prompt administration of justice and the court's right to control its own docket.[10]
Washington's motion for a continuance to obtain new counsel was made orally on the day of trial when the state's subpoenaed witnesses were already present. Washington's trial had already been continued twice, and the motion consisted of a simple request in which Washington's counsel told the court that Washington was "not happy" with him. The court quickly overruled the motion without further investigation about the source of Washington's discontent.
Washington did not specify why he was unhappy with his appointed counsel or how that unhappiness could potentially manifest in prejudice to him. Without more specific information from Washington, or some reasonable explanation about why Washington's unhappiness did not surface until the day of trial, we cannot conclude that the trial court abused its discretion in finding that Washington's motion was made for purposes of delay.
But Washington contends, with some authority, that the trial court erred in not investigating the source of his unhappiness with his appointed counsel. Under certain circumstances, there is "an affirmative duty upon the trial court to inquire, on the record, into a defendant's complaints regarding the adequacy of his appointed counsel," before the court exercises its sound discretion.[11] And under virtually identical circumstances to those in this case, other appellate courts have held that the trial court erred in failing to investigate on the record, even though the initial complaint was entirely vague.[12]
We believe that the better rule requires the defendant to raise concerns about his appointed counsel with sufficient specificity to warrant further investigation.[13] A trial court, without more, does not abuse its discretion in finding that a general allegation of unhappiness with appointed counsel is so vague that it does not require additional investigation. Therefore, Washington's second assignment of error is overruled.
 VII. The Coached Witness
Washington next asserts that his trial was unfair because Mista's sister, Caprice, was coached while she testified. As Caprice began to testify about her age, where she went to school, and who lived with her in her house, Washington objected that someone in the courtroom was shaking his head to encourage her every time she made a statement.
The trial court admonished the party to refrain from coaching the witness and asked him to move to the other side of the courtroom where he could not distract the witness. Caprice then continued to testify on more substantive issues without further objection.
A trial court has the responsibility for determining the method of examination of witnesses that will most effectively lead to the ascertainment of the truth.[14] Thus, we review a court's rulings concerning allegations that a witness has been coached while on the stand according to an abuse-of-discretion standard.[15]
The trial court did not abuse its discretion in handling this matter. First, as soon as the issue was brought to the attention of the court, the court admonished the responsible party and took appropriate, measured remedial action by rearranging the spectators in the courtroom so the witness would not be distracted. Second, the portion of Caprice's testimony that was allegedly coached pertained to simple background information, so Washington cannot demonstrate any prejudicial error. Third, there was no objection that the coaching continued during the more substantive portions of Caprice's testimony in which she specifically contradicted Washington's version of events.[16] And finally, since this incident occurred in open court, it was for the trier of fact to ascertain what effect the observed coaching might have had on the credibility of Caprice's testimony.[17]
Washington's third assignment of error is consequently overruled.
 VII. Closing Comments about Washington's Demeanor
Next Washington complains that, during closing argument, the prosecution told the jury that Washington had not exhibited emotion or "caring" during the trial, and that "[Washington] did not shed a tear for Mista Paige." Washington contends that this argument to the jurors constituted prosecutorial misconduct sufficient to overturn his conviction.
Washington's assertion is simply wrong. The Ohio Supreme Court has examined this very issue and held that a prosecutor does not "err by commenting on [the defendant's] demeanor, body language, and lack of concern during trial."[18]
Washington's fourth assignment of error is overruled.
 VIII. The Manifest Weight of the Evidence
Finally, Washington argues that his conviction was against the manifest weight of the evidence. This assignment requires that we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice.[19] To reverse a jury's verdict under this standard of review, we must "disagree with the factfinder's resolution of the conflicting evidence."[20] But because "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact,"[21] and because the trier of fact is free to believe all, part or none of the testimony of each witness,[22] we should disregard the jury's verdict only in the exceptional case.
Washington's jury did not lose its way and create a manifest miscarriage of justice. The jury chose to believe the medical testimony of Dr. Utz, which tended to make Washington's version of events highly improbable. The jury must also have believed Caprice's conflicting testimony, which demonstrated that Washington struck Mista that morning and was the only person alone with Mista before the child appeared motionless in the stroller. There was no manifest miscarriage of justice in the jury's decision to believe Dr. Utz and Caprice rather than Washington.
Accordingly, we overrule Washington's fifth and final assignment of error, and affirm the trial court's judgment.
 ______________________ Painter, Judge.
 Doan, P.J., and Sundermann, J., concur.
[1] See Crim.R. 16(B)(2).
[2] See Cuyahoga Falls v. Tyson (Mar. 27, 1996), Summit App. No. 17499, unreported.
[3] See State v. Scudder (1994), 71 Ohio St.3d 263, 269, 643 N.E.2d 525,529-530, citing State v. Heinish (1990), 50 Ohio St.3d 231,553 N.E.2d 1026, syllabus.
[4] See State v. Bey (1999), 85 Ohio St.3d 487, 490, 709 N.E.2d 484,490, quoting State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.
[5] See State v. Finnerty (1989), 45 Ohio St.3d 104, 107,543 N.E.2d 1233, 1237.
[6] See AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601;State v. Echols (1998), 128 Ohio App.3d 677, 700, 716 N.E.2d 728,744.
[7] See State v. Blankenship (1995), 102 Ohio App.3d 435, 558,657 N.E.2d 559, 574, citing State v. Pruitt (1984), 18 Ohio App.3d 50,57, 480 N.E.2d 499, 507-508.
[8] See State v. Carter (1998), 128 Ohio App.3d 419, 423, 715 N.E.2d 223,225, quoting State v. Pruitt (1984), 18 Ohio App.3d 50, 57, 480 N.E.2d 499,507. See, also, State v. Carter (June 16, 2000), Hamilton App. No. C-990914, unreported.
[9] See State v. McNeill (1998), 83 Ohio St.3d 438, 452, 700 N.E.2d 596,610; State v. Sowders (1983), 4 Ohio St.3d 143, 144, 447 N.E.2d 118,120.
[10] See State v. Unger (1981), 67 Ohio St.2d 65, 67, 423 N.E.2d 1078,1080; State v. Carter (June 16, 2000), Hamilton App. No. C-990914, unreported, citing State v. Marinchek (1983), 9 Ohio App.3d 22, 23-24,457 N.E.2d 1198, 1200; State v. Cox (Mar. 22, 2001), Franklin App. No. 00AP-565, unreported, citing State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511, unreported.
[11] See State v. Keith (1997), 79 Ohio St.3d 514, 524, 684 N.E.2d 47,58-59, citing State v. Deal (1969), 17 Ohio St.2d 17, 244 N.E.2d 742;State v. Prater (1990), 71 Ohio App.3d 78, 593 N.E.2d 44; State v.VanMeter (July 11, 1985), Franklin App. No. 84AP-987, unreported; Statev. Beranek (Dec. 14, 2000), Cuyahoga App. No. 76260, unreported.
[12] See State v. Prater (1990), 71 Ohio App.3d 78, 593 N.E.2d 44;State v. Beranek (Dec. 14, 2000), Cuyahoga App. No. 76260, unreported.
[13] See State v. Beranek (Dec. 14, 2000), Cuyahoga App. No. 76260, unreported (Porter, J., dissenting), citing State v. Edsall (1996),113 Ohio App.3d 337, 339, 680 N.E.2d 1256, 1257, quoting State v. Smith
(Sept. 14, 2000), Cuyahoga App. No. 76998, unreported.
[14] See R.C. 2945.03; Evid.R. 611(A)(1).
[15] See State v. Linehan (Sept. 4, 1998), Montgomery App. No. 16841, unreported; State v. Barton (Feb. 14, 1992), Lucas App. No. L-90-344, unreported, citing Bean v. Green (1878), 33 Ohio St. 4; Legg v. Drake
(1853), 1 Ohio St. 286.
[16] See, generally, Annotation, Coaching of Witnesses by Spectator at Trial as Prejudicial Error (1962), A.L.R.2d 1142.
[17] See State v. Mundy (1994), 99 Ohio App.3d 275, 308, 650 N.E.2d 502,523, citing State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
[18] See State v. Green (2000), 90 Ohio St.3d 352, 373, 738 N.E.2d 1208,1232, citing State v. Bey (1999), 85 Ohio St.3d 487, 496-497,709 N.E.2d 484, 495, State v. Brown (1988), 38 Ohio St.3d 305, 317,528 N.E.2d 523, 538.
[19] See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720.
[20] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 546-547.
[21] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[22] See State v. Antill (1964), 176 Ohio St. 61, 197 N.E.2d 548.