OPINION
{¶ 1} Raymond MacDonald ("MacDonald") was found guilty of kidnapping, aggravated burglary, and aggravated robbery, each with an accompanying firearm specification, by a jury in the Montgomery County Court of Common Pleas, and the trial court sentenced him accordingly. MacDonald appeals, raising five assignments of error.
{¶ 2} The state's evidence established the following facts.
{¶ 3} On May 16, 2001 at approximately 4:30 in the morning, Ossie Jennings was watching television in the bedroom of her home when she heard a noise in the hallway. Upon investigating, she discovered two intruders in the hallway. When she demanded to know why they were in her house, one of the intruders, who was later identified as MacDonald, said, "Get out of the way, bitch" and hit her with a gun. She fell down, and MacDonald ordered her to stay down. The two men then ran to the other bedrooms, returning to her bedroom last. MacDonald told the second man to watch Jennings. Then, while the second man stood over Jennings holding the gun, Jennings watched MacDonald take money from her purse and search her bedroom, emptying drawers and flipping the mattress. Hers was the only bedroom searched. They then tied her up, and the second man said, "Hey, B.J., man, let's go." One of the men then poured beer on her back, and the two left.
{¶ 4} Jennings described the first intruder as a black man, around six feet tall with a stout build. He was wearing a gray hooded sweatshirt and a blue handkerchief around the bottom of his face. She testified that she had known as soon as she heard him speak that she knew him. She eventually recognized his voice as that of B.J., a friend of her son's. His voice was distinctive because he slurred his words when he spoke. She further testified that there had been nothing in his physical appearance that was inconsistent with his being B.J. and that she had, in fact, seen him wearing the gray hooded sweatshirt on a previous occasion.
{¶ 5} After the two men left, Jennings remained where she was for a few minutes. She then got herself untied and crawled down the hall to the telephone in her kitchen, where she called the police. She told the police when they arrived that one of the men was a friend of her son's, whom she knew as B.J. Jennings' granddaughter, Devine Hampton, aided the police in locating B.J. by providing them with a cell phone number and address. The police determined that the cell phone number belonged to Kevin MacDonald ("Kevin"), one of MacDonald's brothers. Detective William Myers then went to the address provided by Hampton, at which he encountered Ramon MacDonald ("Ramon"), MacDonald's other brother. Ramon told Detective Myers that he did not know anyone named B.J. Detective Myers then took pictures of Ramon and MacDonald to Jennings, and Jennings identified MacDonald as the man she knew as B.J.
{¶ 6} Around the time of MacDonald's preliminary hearing, Ramon and MacDonald's mother ("Mrs. MacDonald") went to Jennings' house and attempted to dissuade her from pressing charges. At that time, Ramon offered to "take care of" the damage that his brother had done. The two did not attempt to persuade Jennings that she had identified the wrong man.
{¶ 7} MacDonald was indicted on June 28, 2001 for kidnapping, aggravated robbery, and aggravated burglary, each with an accompanying firearm specification. He was tried before a jury on October 2 to October 4, 2001. At trial, MacDonald presented an alibi defense, arguing that he had been at home asleep and presenting the testimony of his mother and brothers. However, he was convicted by the jury. The trial court sentenced him on October 29, 2001 to seven years imprisonment for kidnapping, eight years for aggravated burglary, and eight years for aggravated robbery, to be served concurrently. MacDonald also received three years on each firearm specification, to be served concurrently with each other, but consecutively to the sentences for the underlying crimes. Thus, MacDonald received a total sentence of eleven years imprisonment.
{¶ 8} MacDonald appeals, raising five assignments of error.
{¶ 9} "I. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL THROUGH INEFFECTIVE ASSISTANCE OF COUNSEL."
{¶ 10} MacDonald identifies eight circumstances in which he argues his trial counsel was ineffective. We will discuss each of these arguments in the order in which MacDonald has presented them.
{¶ 11} Initially, we note that we evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See id. at 2064-65. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. See id. at 2064. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id. at 2065.
{¶ 12} MacDonald's first argument is that his trial counsel was deficient in failing to request a limiting instruction with respect to three occasions where reference was made to his criminal history. On the first occasion, Detective Myers stated: "[U]pon searching * * * through M.I.S. I found that one time * * * it was noted on [MacDonald's] arrest card that he had used the initial `J'." On the second occasion, the following exchange occurred between the prosecutor and Detective Myers:
{¶ 13} "Q. * * * how do we know that Kevin MacDonald isn't the person known as B.J.?
{¶ 14} "A. I searched all through for Kevin MacDonald. Kevin MacDonald * * * was older, * * * didn't have much activity in our computer system in the past couple years, showed an address on Gardendale, didn't really match the * * * height of the * * * suspect in this crime."
{¶ 15} Finally, on the third occasion, the following exchange occurred between the prosecutor and Ramon MacDonald during cross-examination:
{¶ 16} "Q. * * * Did Raymond come home that night?
{¶ 17} "A. * * * if I can recall, Ma'am * * * I think he was in jail that night * * *.
{¶ 18} "* * *
{¶ 19} "* * * if I can recall what I'm thinkin' is that Detective Myers picked him up that day from his probation * * * officer."
{¶ 20} MacDonald argues that these exchanges could have caused the jury to make the inference, impermissible under Evid.R. 404(B), that he was likely to have committed this offense because he had a criminal record. Consequently, he argues that his attorney was deficient in failing to object to these references to his prior criminal history. Even assuming that the comments did run afoul of Evid.R. 404(B), there are several tactical reasons why attorneys may not object to passing comments like those described above. An attorney might conclude, for example, that it is unwise to draw further attention to the comment. This type of tactical decision is not sufficient to warrant a reversal based upon ineffective assistance of counsel. State v. Bradley (1989),42 Ohio St.3d 136, 144, 538 N.E.2d 373.
{¶ 21} Furthermore, we do not believe that MacDonald can establish that there exists a reasonable probability that the result of his trial would have been different but for counsel's alleged error, as required by the second prong of Strickland. The comments were not introduced for the purpose of leading the jury to make the inference that MacDonald was likely to commit criminal acts, but for the purpose of establishing his identity and testing the memory of one of his alibi witnesses. They were isolated, passing comments that neither the prosecutor nor the witnesses dwelled upon. We are therefore unable to conclude that MacDonald was prejudiced by his counsel's failure to object.
{¶ 22} MacDonald's second argument is that his attorney failed to object to expert testimony given by Ronald Huston. In the testimony about which MacDonald complains, Huston stated that only twenty-five percent of the latent fingerprint evidence that is received by the Miami Valley Regional Crime Laboratory is of value for comparison purposes. He went on to state that only twenty- five to fifty percent of that evidence is of value for the automated fingerprint identification system. Huston stated: "[M]aybe if we're fortunate enough to identify one out of ten prints out of one out of ten cases to a suspect then it's kinda the normal average. * * * But we're basically only hitting about * * * fifteen percent of * * * the AFIS quality prints that we put * * * into our database."
{¶ 23} MacDonald argues that, because no identifiable prints were recovered from the scene, "the jurors' reception of faulty evidence may have left them with a false impression that detectives were less likely to have found Appellant's fingerprints at the scene of the crime than they actually were." MacDonald has provided no support for his contention that the evidence was "faulty." Huston was designated as an expert without objection. The state was certainly entitled to present evidence that fingerprints were not found in all, or even most, cases, to counter MacDonald's argument that his fingerprints were not found at the scene. Furthermore, the testimony was admissible under Evid.R. 702, and any objection would have been overruled. See, also, State v. Woodruff (April 27, 2001), Montgomery App. No. 18164. We therefore conclude that MacDonald's counsel did not fall below the standard of care in not objecting to this testimony.
{¶ 24} In his third argument, MacDonald contends that his trial counsel should have filed a motion to suppress or motion in limine with respect to the identification evidence against him and that his trial counsel failed to properly cross-examine witnesses regarding their identification of him. He essentially argues that, because of her involvement in helping the police to locate MacDonald, Hampton may have obtained the photographs shown to Jennings and Jennings may therefore have seen them prior to the police showing them to her. Thus, he argues that his counsel should have sought to have Jennings' identification suppressed or excluded and should have cross-examined Jennings regarding this possibility.
{¶ 25} There is no evidence in the record to support MacDonald's speculative assertion that Hampton obtained copies of the photographs and showed them to Jennings prior to the police doing so. As such, a motion to suppress or a motion in limine would have been unsuccessful. With regard to counsel's alleged failure to cross-examine witnesses regarding this matter, we have no evidence in the record before us to suggest that counsel had any reason to suspect that Hampton had behaved as MacDonald suggests. Furthermore, we find it to be a reasonable tactical decision to refrain from making unsupported allegations against witnesses during cross-examination, especially when those witnesses are concededly the victims of the crime. Thus, we find this argument to be without merit.
{¶ 26} In his fourth argument, MacDonald contends that his trial counsel erred in failing to object to or move to strike a non-responsive answer. On cross-examination, defense counsel asked Detective Myers if Mrs. MacDonald had told him that MacDonald had been at home when the crimes were committed. He answered, "The first time she couldn't remember which day he was home `cause I didn't tell her what day this happened." MacDonald argues that this testimony could cause the jury to believe that his mother had fabricated his alibi when she found out what day the crime had occurred. As stated above, counsel is not deficient for making a tactical decision not to object to isolated comments such as this. SeeBradley, supra. Furthermore, we do not believe that there is a reasonable probability that the result of the trial would have been different had MacDonald's attorney objected.
{¶ 27} MacDonald's fifth argument regards the testimony of Officer Gregory Moyer, an evidence technician, and Officer Jeffrey Spires. Officer Moyer testified that Jennings had told him that she had been tied up with a lamp cord or belt. Officer Spires testified that Jennings had untied herself and had no longer been restrained by the time he got to the scene. MacDonald argues that this testimony was inadmissible hearsay. Without deciding whether the testimony was, in fact, hearsay, we conclude that MacDonald has not established that he was prejudiced by its admission. Jennings had already testified that she had been tied up and that she had untied herself. Furthermore, MacDonald never argued that the crime had not occurred as Jennings described it. Rather, he challenged her identification of him as the perpetrator of that crime. Therefore, we cannot see how the officers' testimony regarding Jennings having been tied was in any way prejudicial to him. We therefore conclude that he was not denied the effective assistance of counsel in this instance.
{¶ 28} In his sixth argument, MacDonald asserts that his trial counsel was deficient in failing to object to the prosecutor's questioning of MacDonald's alibi witnesses regarding his and their schedules in the days surrounding the incident. He argues that this testimony was irrelevant and prejudicial because it showed the family's "irregular lifestyle." We disagree. It was certainly allowable for the prosecutor to test the memory of MacDonald's alibi witnesses by examining what they could remember of other days surrounding the crime. Furthermore, we do not believe that the testimony that one of MacDonald's brothers played video games and the other went to a strip club was prejudicial to MacDonald. Thus, trial counsel was not ineffective in failing to object to this testimony.
{¶ 29} MacDonald's seventh argument is that his counsel was deficient in failing to object to improper statements made by the prosecutor during closing argument. We discuss MacDonald's arguments regarding prosecutorial misconduct in our discussion of his second assignment of error, infra. Based upon that discussion, we conclude that MacDonald's counsel was not ineffective in failing to object to statements made by the prosecutor during closing argument.
{¶ 30} In his eighth and final argument, MacDonald argues that his trial counsel failed to object to speculative testimony and request that it be stricken. He points to two exchanges between Jennings and the prosecutor. In the first, the prosecutor asked Jennings if she knew what the man named B.J. had been looking for in her house. She replied, "Well, I guess he was lookin' for my money which I told him I didn't have any more." Incidentally, the prosecutor went on to clarify Jennings' answer, asking her how she knew he was looking for money, to which Jennings replied that he had taken money out of her pocketbook. In the second exchange, the prosecutor asked Jennings who poured beer on her back. Jennings replied, "I guess it was him, I don't know for sure."
{¶ 31} We are unable to ascertain how MacDonald believes he was prejudiced by these exchanges, as he has done nothing more than quote them in his brief. We do not believe that he was prejudiced. As we stated above, MacDonald did not argue that the crime did not occur. Rather he argued that he had not been the perpetrator. Thus, statements regarding which perpetrator did what were not prejudicial to MacDonald. Furthermore, the prosecutor clarified both responses.
{¶ 32} Based upon the foregoing discussion, we conclude that MacDonald was not denied the effective assistance of counsel.
{¶ 33} The first assignment of error is overruled.
{¶ 34} "II. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT."
{¶ 35} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing State v.Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947.
{¶ 36} MacDonald divides his prosecutorial misconduct argument into three categories, each asserting multiple specific instances of alleged misconduct. In his first argument, MacDonald contends that the prosecutor mischaracterized evidence and asked improper questions. This argument includes MacDonald's allegations of improper remarks during closing arguments. In the second, he argues that the prosecutor presented evidence under the guise of asking questions. In the third, he asserts that the prosecutor improperly bolstered the testimony of the victim during her opening statement.
 A. Mischaracterizing Evidence and Asking Improper Questions
{¶ 37} In his first argument, MacDonald points to six areas in which he argues that the prosecutor mischaracterized evidence or asked improper questions. The first area regards Jennings' knowledge of her son's friends. During closing argument, the prosecutor stated, "If we'd given her a chance she probably could've rambled off all the people that were out there." MacDonald contends that Jennings actually testified that she knew the voices of people who had been in the neighborhood a long time and that B.J. had not been in the neighborhood a long time. She further stated that she did not know some of her son's friends.
{¶ 38} "Prosecutors are entitled to some latitude in arguing what the evidence has shown and what the jury may infer from the evidence."State v. Tibbetts, 92 Ohio St.3d 146, 169, 2001-Ohio-132, 749 N.E.2d 226. Furthermore, "[t]he prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument." State v. Treesh, 90 Ohio St.3d 460, 466, 2001-Ohio-4,739 N.E.2d 749. We believe that the prosecutor's comment was fair based upon the evidence. Jennings testified that she had made an effort to meet her son's friends, that she had gone outside to determine who MacDonald was when she did not recognize his voice the first time she heard it, and that she could recognize most of the voices in her neighborhood. Furthermore, her son testified that she knew everyone in the neighborhood "from childhood up."
{¶ 39} The second area MacDonald points to involves how well Jennings knew his voice. In closing argument, the prosecutor stated that Jennings "didn't only hear this Defendant say hi, bye. She overheard conversations, more than just one word. She heard sentences coming out of that Defendant's mouth on a fairly frequent basis during that month or so before this happened when they were hanging in the springtime in the alleyway at her house." Jennings testified that she had overheard MacDonald and her son having conversations two or three times, that she had spoken to him once on the phone, and that she had had a very short exchange with him once in person. Given that these conversations all took place in the month before the crime, we believe that it is a fair characterization that she heard him on a "fairly frequent basis" during that time.
{¶ 40} The third area MacDonald points to involves the prosecutor's comment during closing arguments on the memories of MacDonald's alibi witnesses. The prosecutor stated: "They can tell you down to very good minute details what they've done all year if we had let it keep goin'." MacDonald argues that this was a mischaracterization of the evidence because his mother actually stated: "I'm not gonna lie to you because I'm not gonna say I did this and did that. I usually follow a routine and it's the same thing — same — we do almost the same thing every day. But * * * I'm * * * come down to the 20th, the 21st, the 23rd, I'm not gonna lie to you. If you give me Monday, Tuesday and Wednesday maybe I can deal with it — I can tell you better, okay?"
{¶ 41} As stated above, the prosecutor is entitled to some latitude in making a closing argument. See Tibbetts, supra. Taken in context, the prosecutor's comment was a fair comment based upon the detailed memories exhibited by MacDonald's alibi witnesses. It is acceptable for a prosecutor to comment upon the credibility of witnesses based upon their testimony in court. See State v. Mundy (1994),99 Ohio App.3d 275, 304, 650 N.E.2d 502, citing State v. Price (1979),60 Ohio St.2d 136, 398 N.E.2d 772. That is exactly what the prosecutor did in this case. Thus, we do not find the comment to be improper.
{¶ 42} MacDonald's fourth argument concerns the prosecutor's statement that to "say there's no physical evidence to put that Defendant there means nothing." Clearly, the lack of physical evidence did not "mean nothing." However, taken in context, it is clear that the prosecutor was arguing that the lack of physical evidence did not mean that MacDonald had not committed the crime. It was certainly permissible for the prosecutor to address the lack of physical evidence in her closing argument since that was a key argument of the defense. We do not find it likely that this statement would have caused the jury to ignore the lack of physical evidence in their deliberations.
{¶ 43} The fifth argument under this section contends that the prosecutor mischaracterized evidence in stating that the perpetrator of the crime knew Jennings. During her opening statement, the prosecutor stated that the perpetrator knew exactly which bedroom was Jennings'. MacDonald points out that Jennings' testimony indicated that hers was the last room they entered, which would suggest that the intruders did not know where her bedroom was. However, the evidence did show that hers was the only room ransacked. Furthermore, we do not believe that such a statement, made during an opening statement, in which the prosecutor is stating what the evidence is expected to show, prejudiced MacDonald. Furthermore, the jury was instructed that the opening statements were not evidence.
{¶ 44} The prosecutor also made the following statement during closing argument: "This was not a stranger from Illinois. This was somebody who knew her, knew she had money, knew she must've helped out the kids and had money to help out kids." Defense counsel objected to this statement, and the trial court overruled that objection, stating that it was up to the jury to decide. We see no problem with the prosecutor's statement. It was a fair inference based upon the facts. Jennings testified that the intruder she identified as B.J. stated, "I know you got some more money in here." Furthermore, there was testimony that Jennings had been known to have money and help out people in the neighborhood.
{¶ 45} MacDonald's final argument under this section is that the following statement by the prosecutor was improper: "And I'm gonna ask you, you've seen me all week. If we got in a line-up with six other people and I stood here and did that just like I did — the other people did, you'd be able to recognize me." Defense counsel objected, and the trial court sustained the objection. The state concedes that this statement was "inappropriate;" therefore, we are concerned only with whether MacDonald was prejudiced by the statement.
{¶ 46} As the state points out, the jury was instructed that the closing arguments were not evidence. Furthermore, Jennings had admitted to Detective Myers that she would not be able to identify a picture of the perpetrator of the crime, and she reviewed pictures only to identify the person she knew as B.J. Thus, her physical identification was not really at issue in the case. Rather, her identification of the voice of one of the intruders as the man she knew as B.J. was the state's main evidence. The state's comment has no relevance to that identification. The intruder's physical traits were relevant only to the extent that they were not inconsistent with the identification Jennings made of the voice. Thus, we do not believe that the prosecutor's statement prejudiced MacDonald.
 B. Presenting Evidence Under the Guise of Asking Questions
{¶ 47} Under this section of his prosecutorial misconduct assignment, MacDonald argues that it is improper for a prosecutor to introduce evidence under the pretext of asking a question. While we would agree with that statement, we do not believe that the two instances cited by MacDonald rise to this level.
{¶ 48} In the first incident regarding which MacDonald complains, the following exchange occurred when Jennings was recalled for purposes of rebuttal:
{¶ 49} "Q. What did [Ramon MacDonald] say?
{¶ 50} "A. He just started talkin' about his brother. He said: `Well, whatever damage he did or whatever, we would take care of it.'
{¶ 51} "Q. All right.
{¶ 52} "A. Is the way he said it.
{¶ 53} "Q. So, any damage that B.J. did?
{¶ 54} "A. Yes." (Emphasis added).
{¶ 55} MacDonald argues that the prosecutor's insertion of the name B.J. served as evidence that his brother knew him by the nickname B.J. However, we think it is clear that the prosecutor was not attempting to make such an inference, but rather to clarify which brother Ramon was talking about. Furthermore, the prosecutor herself clarified this exchange on her redirect of Jennings:
{¶ 56} "Q. First of all, did [Ramon MacDonald] sit there and say: `I'll just fix the damage" or "I'll fix the damage that B.J. did, that he did.'
{¶ 57} "A. He said my brother.
{¶ 58} "Q. That my brother did?
{¶ 59} "A. Yes."
{¶ 60} This exchange makes it clear exactly what Ramon MacDonald said to Jennings. Thus, we do not find any prosecutorial misconduct in relation to this statement.
{¶ 61} The second exchange occurred during the direct examination of rebuttal witness Donald Wilks, who testified that he had let Mrs. MacDonald and Ramon into Jennings' house. The prosecutor asked Wilks what the woman had said to Jennings, and the following exchange then occurred:
{¶ 62} "A. She was askin' her not to press charges against her son.
{¶ 63} "Q. Okay. Against the — the kid who did this to her?
{¶ 64} "A. Yes." (Emphasis added).
{¶ 65} MacDonald argues that he was prejudiced by the prosecutor's leading question because Mrs. MacDonald testified that MacDonald had been at home asleep at the time of the crime, and the question implies that she knew he had been the perpetrator of the crime. However, Wilks' entire testimony was presented to show exactly that fact. He testified that Mrs. MacDonald had never told Jennings that her son had been home asleep during the crime. He reiterated this fact during cross-examination:
{¶ 66} "Q. * * * She was concerned about her son. And she was trying to talk Mrs. Jennings into dropping the charge against her son because she thought Mrs. Jennings was wrong, was mistaken.
{¶ 67} "A. No, I think she was tryin' to talk her son — * * * Mrs. Jennings outta — into dropping the charges because she didn't want to see him go to jail."
{¶ 68} We do not believe that MacDonald was prejudiced by the prosecutor's question given that it implied the very thing about which Wilks was testifying. Wilks' testimony was certainly admissible to rebut MacDonald's mother's version of events.
{¶ 69} Therefore, we do not believe that either of the above exchanges constituted prosecutorial misconduct.
 C. Improperly Bolstering the Credibility of Jennings
{¶ 70} MacDonald argues that the prosecutor improperly bolstered the credibility of Jennings during her opening statement. The prosecutor stated: "There's a real quiet dignity about this woman and she's been able to live in this neighborhood and get along in this neighborhood for a very long time. And that dignity is what I think you really will notice when she testifies because she * * *." At that point, defense counsel objected, and the trial court sustained the objection.
{¶ 71} We do not believe that the prosecutor's statement improperly bolstered the credibility of Jennings. The prosecutor never mentioned Jennings' credibility or truthfulness. She stated that Jennings had dignity, which does not necessarily correlate with credibility. Furthermore, MacDonald did not accuse Jennings of lying about his being involved. Rather, he questioned her ability to accurately identify him based upon the circumstances. Her dignity has no relationship to her ability to identify MacDonald as one of the perpetrators of this crime.
{¶ 72} For the foregoing reasons, we conclude that MacDonald was not denied a fair trial by prosecutorial misconduct.
{¶ 73} The second assignment of error is overruled.
{¶ 74} "III. THE GUN SPECIFICATIONS WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE."
{¶ 75} Under this assignment of error, MacDonald argues that the jury's verdict on the gun specifications was against the manifest weight of the evidence. He asserts that the guns were never fired, neither of the intruders verbally threatened to shoot Jennings with a gun, and Jennings testified that she did not know whether the guns worked or if they were toys.
{¶ 76} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
{¶ 77} In Thompkins, the supreme court discussed what could constitute sufficient evidence to prove a firearm specification.Thompkins, supra, at 383-84. While MacDonald makes a manifest weight, rather than a sufficiency, argument, the supreme court's discussion inThompkins is helpful. The court noted that: "The state must present evidence beyond a reasonable doubt that a firearm was operable at the time of the offense before a defendant can receive an enhanced penalty pursuant to R.C. 2929.71(A). However, such proof can be established beyonda reasonable doubt by the testimony of lay witnesses who were in aposition to observe the instrument and circumstances surrounding thecrime." Id. at 383 (emphasis sic), quoting State v. Murphy (1990),49 Ohio St.3d 206, 551 N.E.2d 932, syllabus. The court further stated that "it should be abundantly clear that where an individual brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable." Id. at 384.
{¶ 78} In this case, Jennings testified that the intruder she recognized as B.J. had a gun in his hand. She described it as a black gun. While she did state at one point that she could not be sure that the gun was not a toy, this statement was made while she was discussing her initial observations of the robbers. She also testified that B.J. had hit her with the gun, and Detective Myers testified that she had had a dark bruise on her arm where she claimed to have been hit. When describing being hit with the gun, Jennings testified that it had not been a toy. Jennings also testified that the man with the gun told her to shut up and pointed the gun at her.
{¶ 79} Based upon the testimony presented at trial, the jury could have concluded that MacDonald had brandished a gun and implicitly threatened to shoot Jennings. We do not believe that the jury clearly lost its way in making the determination that the gun was an operable firearm.
{¶ 80} The third assignment of error is overruled.
{¶ 81} "IV. APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
{¶ 82} Under this assignment of error, MacDonald claims that his conviction was against the manifest weight of the evidence. He essentially attacks Jennings' identification of him as one of the intruders in her home. He argues that she had only heard two or three conversations between her son and him, and that she had only spoken to him personally on two brief occasions. He also points to her language upon initially being questioned by the police that she thought his name was B.J. and argues that she was too hysterical following the crime to make a reliable identification. Further, MacDonald asserts that she was not able to make a physical identification and that there was no physical evidence of the crime. Finally, MacDonald points to his alibi.
{¶ 83} We will not reverse a conviction as against the manifest weight of the evidence unless the evidence presented at trial weighs heavily against the conviction. See Martin, supra. While we acknowledge that the evidence against MacDonald consisted almost entirely of Jennings' identification, there was certainly enough evidence presented to support her ability to make an identification that the jury could find MacDonald guilty.
{¶ 84} Jennings testified that she had recognized the voice of one of the intruders as one of her son's friends. Several people testified that MacDonald's voice was distinctive, which would make it easier to identify. When the two intruders were leaving, the second one said, "Hey, B.J., man, let's go." Both Jennings and her son testified that MacDonald had gone by the nickname B.J. Furthermore, the build of the intruder was consistent with MacDonald's build, and the intruder wore a gray hooded sweatshirt that Jennings had seen MacDonald wearing.
{¶ 85} The state also presented evidence that members of MacDonald's family had gone to visit Jennings to try to convince her to not press charges. Neither his mother nor brother told her that he had been at home at the time of the crime, and his brother offered to pay for the damage that MacDonald had done. This evidence undercut the alibi evidence presented by MacDonald. Furthermore, his family had an obvious bias and may simply not have been believed by the jury.
{¶ 86} Based upon the evidence presented at trial, we cannot conclude that the evidence weighed heavily against the conviction. Thus, MacDonald's conviction was not against the manifest weight of the evidence.
{¶ 87} The fourth assignment of error is overruled.
{¶ 88} "V. THE CUMULATIVE ERROR COMMITTED AT TRIAL DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL."
{¶ 89} Under this assignment of error, MacDonald argues that the cumulative weight of the errors denied him a fair trial. We have identified very few even arguable errors, and those that we have identified were clearly not prejudicial to MacDonald. Such errors cannot form the basis of a reversal based upon cumulative error. See State v.Nields, 93 Ohio St.3d 6, 41, 2001-Ohio-1291, 752 N.E.2d 859.
{¶ 90} The fifth assignment of error is overruled.
{¶ 91} The judgment of the trial court will be affirmed.
BROGAN, J. and GRADY, J., concur.