OPINION *Page 2 
{¶ 1} Appellant, Matthew Smith, appeals from his conviction of one count of sexual imposition, a misdemeanor of the third degree, in violation of R.C. 2907.06(A)(3). The underlying facts are as follows:
 {¶ 2} On February 10, 2008, Lulabell Smith, a State Tested Nurse's Aid ("STNA"), at Smith Nursing Home, began her shift at 11:00 p.m. She walked into patient J.M.'s room and noticed that the privacy curtain was pulled halfway around J.M.'s bed. She saw shoes and pants on top of J.M's bedding. As she walked around the curtain, she observed Appellant on top of J.M., "puttin' his leg over and then like he was getting' in position." Ms. Smith immediately asked Appellant what he was doing and he jumped up and responded "nothing." Ms. Smith then noticed that J.M.'s pants and underwear were pulled down past her thighs, exposing her genital area. J.M.'s pajama top was also unbuttoned, but she was wearing a t-shirt underneath her pajamas, so her breasts were not exposed. J.M., who suffers from dementia, was asleep during this entire episode.
 {¶ 3} Ms. Smith walked to the nurses' station and reported what she saw to Nurses Tonja Grant and Lori Provitt. Ms. Provitt was the charge nurse for the shift.
 {¶ 4} Nurse Grant went to J.M.'s room and found J.M. in the same exposed condition. After Nurse Grant left the room, Ms. Smith helped rearrange J.M.'s clothing and covered her up.
 {¶ 5} Nurse Grant returned to the nurses' station and informed Charge Nurse Provitt of her observations. Following the nursing home's protocol, Charge Nurse Provitt called the Director of Nursing, Deana Vrabel, at home. Nurse Provitt was told *Page 3 
not to document this incident in a "nurse note", but rather, was told to have everyone write down their observations on a piece of notebook paper. Ms. Vrabel informed Nurse Provitt "that she would take care of it in the morning." Charge Nurse Provitt was further instructed by Ms. Vrabel not to call the police or seek medical treatment for J.M. She was told to contact the nursing home administrator, Abraham Smith.
 {¶ 6} Abraham Smith, who is the first cousin of Appellant, testified that he has been the administrator of Smith Health Care Center for 36 years. The business has been owned and operated by his family for 46 years.
 {¶ 7} Abraham Smith confirmed that Appellant is a resident of Smith Health Care Center and that his stay is paid for by Medicaid. Appellant's admission diagnoses are hypertension (high blood pressure) and tobacco use disorder, which Mr. Smith stated means he smokes a lot. Mr. Smith was not sure why Appellant is a resident at his family's medical facility. Mr. Smith testified "I really don't know [why he's here] unless I would read what the doctor says — our medical director."
 {¶ 8} According to Mr. Smith, and several nurses who testified, Appellant has no mental defects, does not suffer from Alzheimer's or dementia and is capable of making his own decisions. Appellant is permitted to check himself out of the facility for up to 30 days a year. If he is out of the facility for more than thirty days, then Medicaid will cease to pay for his care. Mr. Smith admitted that he knew of the situation the day after it happened and it was not until the next day that he contacted Diane Bardash and instructed her to handle the matter. Mr. Smith admitted that the proper actions were not taken in this case. *Page 4 
 {¶ 9} On February 11, 2008, Diane Bardash, LSW, Smith Nursing Home Director of Marketing and Admissions, began her shift at 7:30 a.m. She was informed as to what happened the evening before. She then contacted nursing home administrators regarding getting J.M. medical treatment. She also spoke with Appellant, who gave her a completely inconsistent story as to how J.M. was found. Later that afternoon, Ms. Bardash took J.M. to Mercy Medical Center for treatment.
 {¶ 10} After arriving at Mercy Medical Center, Ms. Bardash and J.M. were met by Officer Deborah Geiger of the Canton Police Department at approximately 2:45 p.m. J.M. had no idea what had happened to her the night before and fell asleep on the examining room table. Jean Morgan, a Sexual Assault Nurse Examiner (SANE), conducted a sexual assault examination on J.M., but did not conduct an internal exam based upon the allegations. Nurse Morgan observed redness to the outside of J.M.'s vagina.
 {¶ 11} Nurse Morgan also examined Appellant and collected DNA samples from him. The samples, along with clothing and other evidence, were sent to the Canton-Stark County Crime Lab. Jennifer Creed, a criminalist from the lab, testified that no forensic evidence was detected in any of the samples that would link Appellant to J.M. Due to the length of time between the assault and taking J.M. to the hospital, though, Criminalist Creed testified that "the longer the period of time between the incident and the collection of evidence, the more possibility there is for evidence to be lost."
 {¶ 12} Detective John Gabbard of the Canton Police Department interviewed Appellant and other witnesses to the incident. Appellant's story differed from the other witnesses. He stated that he saw J.M. wandering around outside of her room without *Page 5 
her pants on and that he helped her back into her room and into her bed. He also admitted to Detective Gabbard that if J.M. were sexually assaulted, she would not be able to give a reliable statement because of "how confused she gets".
 {¶ 13} On February 14, 2008, Appellant was charged with one count of gross sexual imposition. On February 22, 2008, a preliminary hearing was held in Canton Municipal Court. The court bound the case over to the Stark County Grand Jury. On March 25, 2008, the case was remanded back to the Canton Municipal Court.
 {¶ 14} On that same date, a misdemeanor indictment was filed in Canton Municipal Court. Appellant was arraigned on March 26, 2008, on one count of sexual imposition, a misdemeanor of the third degree.
 {¶ 15} Appellant exercised his right to a jury trial and was found guilty as charged in the indictment. The court sentenced Appellant to sixty days in jail with credit for fifty-six days served, and he was classified as a sexually oriented offender pursuant to then R.C. 2950.04.
 {¶ 16} Appellant raises four Assignments of Error:
 {¶ 17} "I. APPELLANT'S FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS IN THE UNITED STATES CONSTITUTION AND SECTION 1 ARTICLE 1 OF THE OHIO CONSTUTITION [SIC] WERE VIOLATED WHEN HER [SIC] INDICTMENT FAILED TO CONTAIN AN ESSENTIAL ELEMENT OF THE OFFENSE — THE `PURPOSELY' MENS REA ELEMENT.
 {¶ 18} "II. APPELLANT'S FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS IN THE UNITED STATES CONSTITUTION AND SECTION 1 ARTICLE 1 OF THE OHIO CONSTUTITION [SIC] WERE VIOLATED WHEN THE TRIAL COURT *Page 6 
FAILED TO INSTRUCT THE JURY ON THE REQUISITE MENS REA — `PURPOSELY', AND ERRONEOUSLY INSTRUCTED THE JURY ON THE MENS REA OF `KNOWINGLY.'
 {¶ 19} "III. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT APPELLANT'S MOTION TO CONTINUE.
 {¶ 20} "IV. APPELLANT'S CONVICTION FOR ONE COUNT OF SEXUAL IMPOSITION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I II {¶ 21} We address Appellant's first and second assignments of error together, as Appellant agues that his rights were violated due to the exclusion of a definition of the word "purpose" as it relates to the charge of sexual imposition in both his indictment and in the jury instructions.
 {¶ 22} Appellant first claims that his indictment violated State v.Colon, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917 (Colon I) because it did not specify the mens rea of purpose for the charge of sexual imposition. He argues that the indictment was defective and therefore resulted in structural error. We disagree.
 {¶ 23} Colon I, supra, concerned an indictment for robbery in violation of R.C. 2911.02(A)(2), which provides:
 {¶ 24} "No person, in attempting or committing a theft offense * * * shall do any of the following: * * *
 {¶ 25} "(2) Inflict, attempt to inflict, or threaten to inflict physical harm."
 {¶ 26} The Colon I court held: *Page 7 
 {¶ 27} "R.C. 2911.02(A)(2) does not specify a particular degree of culpability for the act of `inflict[ing], attempt[ing] to inflict, or threaten [ing] to inflict physical harm,' nor does the statute plainly indicate that strict liability is the mental standard. As a result, [pursuant to R.C. 2901.21(B),] the state was required to prove, beyond a reasonable doubt, that the defendant recklessly inflicted, attempted to inflict, or threatened to inflict physical harm." Colon, 2008-Ohio-1624, ¶ 14,118 Ohio St.3d 26, 885 N.E.2d 917.
 {¶ 28} In the present case, Appellant was charged with and convicted of one count of sexual imposition in violation of R.C. 2907.06(A)(3), which states:
 {¶ 29} "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * *
 {¶ 30} "(3) The offender knows that the other person, or one of the other persons, submits because of being unaware of the sexual contact." (Emphasis added).
 {¶ 31} Sexual contact means: "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "Sexual arousal" and "sexual gratification" are not defined in the Ohio Revised Code. See In re Anderson (1996), 116 Ohio App.3d 441, 443,688 N.E.2d 545. However, "R.C. 2907.01(B) contemplate[s] any touching of the described areas which a reasonable person would perceive as sexually stimulating or gratifying." State v. Gesell, 12th Dist. No. CA2005-08-367, 2006-Ohio-3621, at ¶ 23, quoting State v. Astley
(1987), 36 Ohio App.3d 247, 250, 523 N.E.2d 322. *Page 8 
 {¶ 32} As this Court noted in State v. Vance, 5th Dist. No. 2007-COA-035, 2008-Ohio-4763, the Supreme Court reconsideredColon I in State v. Colon ("Colon II"), 119 Ohio St.3d 204,2008-Ohio-3749, 893 N.E.2d 169. In Colon II, the Court held:
 {¶ 33} "Applying structural-error analysis to a defective indictment is appropriate only in rare cases, such as Colon I, in which multiple errors at the trial follow the defective indictment. In Colon I, the error in the indictment led to errors that `permeate[d] the trial from beginning to end and put into question the reliability of the trial court in serving its function as a vehicle for determination of guilt or innocence.' Id . at ¶ 23, 885 N.E.2d 917, citing State v. Perry,101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 17. Seldom will a defective indictment have this effect, and therefore, in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) plain-error analysis." Id. at ¶ 8. The Court noted the multiple errors that occurred in Colon I:
 {¶ 34} "As we stated in Colon I, the defect in the defendant's indictment was not the only error that had occurred: the defective indictment resulted in several other violations of the defendant's rights. 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, ¶ 29. InColon I, we concluded that there was no evidence to show that the defendant had notice that recklessness was an element of the crime of robbery, nor was there evidence that the state argued that the defendant's conduct was reckless. Id. at ¶ 30, 885 N.E.2d 917. Further, the trial court did not include recklessness as an element of the crime when it instructed the jury. Id. at ¶ 31, 885 N.E.2d 917. In closing argument, the prosecuting attorney treated robbery as a strict-liability offense. Id. Colon II at ¶ 6." See also, Vance, supra at ¶ 51-53. *Page 9 
 {¶ 35} Unlike Colon I, the four prongs necessary to establish structural error are not met in this case. The jury had notice that purpose was an element of the crime of sexual imposition. In closing argument, Appellant's trial counsel argued:
 {¶ 36} "One thing you need to remember is that Lulabell did not ever testify that she observed Mr. Smith touching Ms. Murray in any appropriate [sic] manner. And that's key because the State has to prove to you that he had sexual contact with her and the Judge will instruct you that that means the touching of an erogenous zone which includes the thigh, buttocks, pubic region or the breast of a female for the purpose of sexual gratification or arousal."
 {¶ 37} Further, the jury was instructed as follows:
 {¶ 38} "Before you can find the accused guilty, you must find beyond a reasonable doubt that on or about February 10, 2008, in the City of Canton, Stark County, Ohio, the accused did have sexual contact with [J.M.] who is not the spouse of the accused and that the accused knew that [J.M.] submitted because she was unaware of the sexual contact. A person acts knowingly regardless of his purpose when he is aware that his conduct will probably cause a certain result or he is aware that his conduct will probably be of a certain nature. A person has knowledge of the circumstances when he is aware that such circumstances probably exist. Knowingly means a person is aware of the existence of the facts and that his acts will probably cause a certain result or be of a certain nature. Sexual contact means any touching of the erogenous zone of another, including, without limitation, the thigh, genitals, buttock, pubic region, or if the person is a female, a breast, for thepurpose of sexually arousing or gratifying either person." (Emphasis added). *Page 10 
 {¶ 39} Accordingly, we cannot say that the omission of the definition of the word "purpose" in the indictment permeated the whole trial. As structural error is not present in this case, this Court may analyze the error in this case pursuant to the Crim. R. 52(B) plain-error analysis.Colon II, supra, at ¶ 7.
 {¶ 40} Crim. R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. In order to find plain error under Crim. R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise. Id. at paragraph two of the syllabus. Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to `prevent a manifest miscarriage of justice.'" State v. Barnes (2002), 94 Ohio St.3d 21, 27,759 N.E.2d 1240, quoting State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus. Perry, supra, at 118,802 N.E.2d at 646.
 {¶ 41} Given that the trial court did instruct on the definition of sexual contact, and that counsel argued that Appellant must have had the purpose to sexually arouse or gratify, we do not find that plain error exists in this case, nor do we find such a manifest miscarriage of justice that warrants a reversal. *Page 11 
 {¶ 42} Appellant also challenges the court's jury instruction on the charge of sexual imposition. He argues that because the trial court failed to define "purpose" with respect to the element of sexual contact, he did not receive a fair trial.[1]
 {¶ 43} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Wolons (1989), 44 Ohio St.3d 64, 541 N.E.2d 443. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 44} "The definition of sexual contact includes an express culpability requirement of `purpose.'" State v. Curtis, 12th Dist. No. CA2008-01-008, 2009-Ohio-192, at ¶ 90, citing State v. Mundy (1994), 99 Ohio App.3d 275, 295. When determining if sexual contact occurred, the trier of fact should infer from the evidence presented at trial whether the defendant's purpose was sexual arousal or gratification by his contact with those areas of the body proscribed in R.C. 2907.01(B). State v. Gesell, supra, at ¶ 24. The trier of fact should consider the type, nature, and circumstances of the contact when making its decision. Along with viewing the personality and demeanor of the defendant, the trier of fact may "infer what the defendant's motivation was in making the physical contact with the victim. If the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was *Page 12 
achieved." Id. citing State v. Cobb (1991), 81 Ohio App.3d 179, 195,610 N.E.2d 1009. See also Anderson, 116 Ohio App. 3d at 444.
 {¶ 45} "While the purpose of sexual arousal or gratification is an essential element of the offense of gross sexual imposition, there is no requirement that there be direct testimony regarding sexual arousal or gratification. See In re D.S., Warren App. Nos. CA2004-04-036 and CA2004-04-046, 2006-Ohio-18003, ¶ 19, citing In re Anderson (1996),116 Ohio App.3d 441, 443-444; State v. Mundy (1994), 99 Ohio App.3d 275,289. In determining the defendant's purpose, the trier off act may infer what the defendant's motivation was in making the physical contact with the victim. Id.; State v. Cobb (1991), 81 Ohio App.3d 179."Gesell, at ¶ 25.
 {¶ 46} In addressing an argument similar to the one put forth by Appellant, the Eleventh District determined that the trial court's failure to instruct a jury that a defendant's sexual contact must have been made purposely did not rise to the level of plain error. SeeState v. Breland, 11th Dist. No. 2003-A-0066,2004-Ohio-7238, ¶ 26. The court determined that while the definition of sexual contact mentions the word "purpose", no direct evidence of a defendant's mental state is required. Moreover, the Twelfth District, inCurtis, in evaluating an identical claim, determined that "it is sufficient to present circumstantial evidence from which the finder of fact can infer the purpose of the act was for sexual gratification * * *." Curtis, supra, at ¶ 91 (internal citations omitted).
 {¶ 47} We also find that this instruction does not rise to the level of abuse of discretion. While perhaps the better course of action would be for the trial court to include definitions of relevant terms, such as "purpose", we cannot find that the trial *Page 13 
court's actions were arbitrary, capricious, or unreasonable. The jury could reasonably infer, in this case, that Appellant's actions of pulling the victim's pants down and lying on top of her while she was unaware in her bed were for the purpose of sexually arousing or gratifying himself. Curtis, at ¶ 92, Gesell, supra at ¶ 25,Breland, at ¶ 26.
 {¶ 48} It is well settled that a trial court does not need to give a proposed jury instruction in the exact language requested by its proponent, even if it properly states the rule of law to be applied. The trial court retains discretion to utilize its own language to convey proper legal principles. Youssef v. Parr, Inc. (1990),69 Ohio App.3d 679, 690. In this case, the trial court set forth the legal principles necessary for the jury to determine Appellant's guilt and Appellant has failed to demonstrate that he was prejudiced by the trial court's failure to give the "expanded definition of purpose." City of BedfordHeights v. Nathanson (July 25, 1996), 8th Dist. No. 69937, citing Wilson v. Dixon (Mar. 29, 1990), Cuyahoga App. No. 56788.
 {¶ 49} Appellant's first and second assignments of error are overruled.
 III {¶ 50} In his third assignment of error, Appellant argues that the trial court abused its discretion in failing to grant Appellant's motion for continuance. We disagree.
 {¶ 51} The decision to grant a continuance is within the trial court's discretion. State v. Unger (1981), 67 Ohio St.2d 65, 67,423 N.E.2d 1078, syllabus. As the Supreme Court stated in Ungar v. Sarafite, (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 849: "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances *Page 14 
present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."
 {¶ 52} "Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice."State v. Unger (1981), 67 Ohio St.2d at 67, 423 N.E.2d 1078. In evaluating a motion for a continuance, a court should consider (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique facts of each case. Id. at 67-68.
 {¶ 53} Having carefully reviewed the record in this case, we do not find that the trial court abused its discretion in denying the two day continuance. On April 8, 2008, this matter was set for a motion hearing. The case was set to begin trial on April 9, 2008, which was the last day it could be tried for speedy trial purposes pursuant to R.C. 2945.71. Appellant requested a two day continuance until April 11, 2008, to review discovery documents provided by the prosecutor on April 8. Appellant agreed to waive time for two days, but not for any longer period of time.
 {¶ 54} The trial court was unable to reschedule the trial for April 11, because the court could not find another judge to cover the docket with only two days notice. The court offered to reschedule the trial for April 21, 2008, but Appellant refused to wait the ten extra days for trial to begin. *Page 15 
 {¶ 55} The State had already coordinated the presence of eight witnesses to prove its case, including one hostile witness and one witness who had rearranged her schedule to appear at trial. The State turned over discovery documents to Appellant as soon as the State received them.
 {¶ 56} Appellant had been represented by the Stark County Public Defender since his arraignment in February, 2008. Counsel was familiar with all aspects of the case with the exception of the discovery documents, of which only a small fraction were used in trial, and all of which were Appellant's medical records. The State separated out these documents and hand-delivered them to Appellant prior to the start of trial.
 {¶ 57} The record is devoid of any indication that the court acted arbitrarily, unreasonably, or unconscionably. The court offered Appellant a new court date ten days out from the one he requested, but Appellant refused that date. The court was unable to rearrange its docket to hear the case at the time that Appellant demanded it be continued to, and the State had gone to great lengths to secure the presence of multiple witnesses on the already scheduled trial date.
 {¶ 58} Appellant's third assignment of error is overruled.
 IV {¶ 59} In his fourth assignment of error, Appellant claims that his conviction for one count of sexual imposition is against the manifest weight of the evidence.
 {¶ 60} When analyzing a manifest weight claim, this court sits as a "thirteenth juror" and in reviewing the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest *Page 16 
miscarriage of justice that the conviction must be reversed." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 548, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.[2]
 {¶ 61} In order to prove that Appellant was guilty of sexual imposition, the State needed to prove that Appellant had "sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender," when he knew "that the other person, or one of the other persons, submits because of being unaware of the sexual contact." R.C. 2907.06(A)(3).
 {¶ 62} As we have previously stated, sexual contact is defined as ""any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).
 {¶ 63} In this case, Appellant was found lying on top of the victim by the nurse's aid, Lulabell Smith. When he was confronted by Ms. Smith, he jumped off of the victim. After he climbed off of J.M., Ms. Smith discovered that J.M.'s pajama bottoms and underwear were halfway down her thigh and that her private area was completely exposed.
 {¶ 64} Due to a string of errors by the nursing home staff, this incident was not reported to the police that night. In fact, it was not until over a day after the incident took place that J.M. was transported to Mercy Medical Center for a sexual assault examination. The nursing home did not contact the police department; rather, the hospital did upon admitting J.M. for a sexual assault exam. *Page 17 
 {¶ 65} Jane Morgan, a Sexual Assault Nurse Examiner (SANE) for Mercy Medical Center, examined J.M. and determined that J.M. had tenderness and redness outside the opening of her vaginal area. She described the area as closer to the inside of the vagina as opposed to the exterior of the vaginal area. Nurse Morgan opined that this redness was a result of digital penetration and stated that this type of vaginal trauma could not have been caused by excessive wiping or accidental movement.
 {¶ 66} Nurse Morgan verified that no DNA of Appellant's was found on J.M.'s body, but also stated that time is of the essence when collecting evidence in sexual assault cases.
 {¶ 67} Appellant was interviewed by Sergeant Gabbard of the Canton Police Department. He told Sergeant Gabbard that he found J.M. naked from the waist down in the hallway of the nursing home and that he helped her back into her room and covered her up. He also admitted to Sergeant Gabbard that J.M.'s dementia would probably prohibit her from being able to tell anyone what happened to her.
 {¶ 68} Appellant also spoke to Charge Nurse Provitt the night of the assault and stated to her, without a question being asked, "that he wasn't doing what I thought he was doing." When Nurse Provitt asked Appellant, "What do you think I think you were doing?", Appellant responded by stating that the victim had wandered out without any clothes on and he was helping her back to her room.
 {¶ 69} Based on these facts, we do not find that Appellant's conviction was against the manifest weight of the evidence. Appellant's fourth assignment of error is overruled. *Page 18 
 {¶ 70} For the foregoing reasons, we overrule Appellant's assignments of error. The judgment of the City of Canton Municipal Court is affirmed.
[1] Appellant also argues that the trial court erred in defining the mens rea of "knowingly". We disagree. "Knowingly", along with "purpose" is a mens rea of R.C. 2907.06(A)(3). In order to be convicted of sexual imposition under this section, it must be established a defendant "knows that the other person, or one of the other persons, submits because of being unaware of the sexual contact." (Emphasis added).
[2] We do not view a manifest weight argument in a light most favorable to the prosecution, as the State argues in its brief.
By: Delaney, J. Hoffman, P.J. and Edwards, J. concur. *Page 19